EL PUEBLO DE PUERTO RICO, apelado, *v.* HÉCTOR DE LEÓN MARTÍNEZ, acusado y apelante.

*Número:* CR-88-15 *Resuelto:* 16 de febrero de 1993

*José Enrique Ayoroa Santaliz,* abogado del apelante; *Norma Cotti Cruz, Subprocuradora General,* y *Miriam Álvarez Archilla, Procuradora General Auxiliar,* abogadas del apelado.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

El presente recurso de apelación trae ante nos una cuestión novel. Debemos interpretar por primera vez el Art. 145 del Código Penal, 33 L.P.R.A. sec. 4186, a los fines de determinar el alcance del término "comunicación privada personal".

# I

El apelante Héctor De León Martínez presentó una demanda civil por violación de contrato contra la Universidad Interamericana de Puerto Rico y Hugo Burgos, jefe del Departamento de Contabilidad de esa institución. Al momento de los hechos, De León Martínez se desempeñaba como profesor de contabilidad en la mencionada universidad. Antes de que llegase a dilucidarse esta controversia, la Universidad Interamericana de Puerto Rico ordenó y efectuó una evaluación del profesor De León Martínez por un comité ad hoc.

Sin que se produjese resultado alguno de la evaluación efectuada, el apelante fue citado para una nueva evaluación que realizaría otro comité distinto, integrado por el demandado Hugo Burgos y por los profesores Delia Márquez y Rafael Balzac.

El apelante asistió a una vista de esta segunda evaluación llevando consigo una grabadora. Allí comenzó a grabar los procedimientos sin que los miembros del comité prestaran su consentimiento y sin que se percataran de ello. Su intención era tener constancia de lo que allí pasara, movido por temor ante la presencia del profesor Burgos. Durante la vista, la profesora Márquez se percató de la actuación del apelante, lo que dio lugar a una agria discusión y a la posterior presentación de cargos contra de León Martínez.

Al apelante se le formularon cargos por agresión,[1] alteración a la paz[2] y por violación al Art. 145 del Código Penal, *supra*. El tribunal de instancia lo absolvió por el cargo de agresión y lo declaró culpable por alteración a la paz y violación al Art. 145 del Código Penal, *supra*.

Inconforme con el veredicto, el apelante recurrió ante

---

[1] Art. 95 del Código Penal, 33 L.P.R.A. sec. 4032.

[2] Art. 260 del Código Penal, 33 L.P.R.A. sec. 4521.

nos alegando que el tribunal a quo cometió los siguientes dos (2) errores:

1. Incidió el Honorable tribunal de instancia, como cuestión de Derecho, al aplicar las disposiciones contenidas en el Art. 145 del Código Penal, supra, a la situación de hechos del presente caso y a ese tenor declarar culpable al acusado.
2. Incidió el Honorable tribunal de instancia, como cuestión de hecho y derecho, al no conceder el beneficio de duda razonable al acusado optando por declararlo culpable de infracción al Art. 260 del Código Penal, 33 L.P.R.A. sec. 4521.

## II

El Art. 145 del Código Penal, *supra*, dispone:

Toda persona que participe en una *comunicación privada personal* bien sea comunicación telefónica o cualquier otro medio o cualquier persona extraña a la misma, que grabe dicha comunicación por cualquier medio mecánico o de otro modo sin el consentimiento expreso de todas las partes que intervinieren en dicha comunicación será sancionada con pena de reclusión, por un término fijo de dos (2) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de tres (3) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.

El tribunal, a su discreción, podrá imponer la pena fija de reclusión establecida o pena de multa que no excederá de cinco mil (5,000) dólares, o ambas penas. (Énfasis suplido.)

Del texto del artículo se desprende que la prohibición va dirigida única y exclusivamente a aquellas comunicaciones que sean consideradas "privadas personales", concepto cuyo alcance nos toca dilucidar.

■ Al interpretar las disposiciones del Código Penal, nos obliga el principio de legalidad conforme al cual los estatutos penales deben interpretarse *restrictivamente*, Art. 8 del Código Penal, 33 L.P.R.A. sec. 3031; *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404 (1988); *Pueblo v. Ríos Nogueras*, 114 D.P.R. 256 (1983); *Pueblo v. Uriel Álvarez*, 112

D.P.R. 312 (1982); sin menoscabar, claro está, la intención del legislador, de ser ésta conocida o evidente. *Pueblo v. Burgos Torres*, 120 D.P.R. 709 (1988); *Pueblo v. Hernández Colón*, 118 D.P.R. 891 (1987); *Pueblo v. Mantilla*, 71 D.P.R. 36 (1950). Con estos principios en mente, pasamos a interpretar el artículo ante nos.

El Art. 145, *supra*, tiene como antecedente el Art. 3 de la Ley Núm. 66 de 10 de junio de 1953([3]) (33 L.P.R.A. sec. 2160). Entonces, la prohibición estaba limitada a la grabación de comunicaciones telefónicas.([4]) Dicho Art. 3 fue aprobado sin enmiendas ni discusiones por ambos cuerpos legislativos. 2 Diario de Sesiones de la Asamblea Legislativa 1514 y 1530 (1953); Diario de Sesiones, *supra*, T. 3, pág. 2154.

En el Informe de la Comisión de lo Jurídico de la Cámara de Representantes —que contiene una clara expresión de la intención legislativa del referido Art. 3— suscrito el 9 de mayo de 1953 por Don Santiago Polanco Abreu, Presidente de dicha comisión, se señalaba que la aprobación de dicho artículo consagraría uno de los conceptos más necesarios para asegurar la libertad del individuo. Continuaba diciendo:

La inviolabilidad de la persona se extiende a todo los (sic) que es necesario para el desarrollo y expresión de la misma. El hogar, los muebles y utensilios, los libros y papeles poseídos por un ciudadano son como una prolongación de su persona, pues

---

([3]) "Ninguna persona que participe en una comunicación telefónica ni ninguna otra persona extraña a la misma, grabará ninguna comunicación telefónica mediante ningún procedimiento mecánico, ni permitirá que dicha comunicación sea oída por ninguna persona, por medio de una extensión del teléfono, o por cualquier otro medio, a no ser con el consentimiento expreso de todas las partes que intervinieren en dicha comunicación telefónica." 33 L.P.R.A. sec. 2160.

([4]) Por su claro tenor literal, este artículo únicamente prohibía las grabaciones de las comunicaciones *telefónicas*. La razón de ser de ello es evidente. La interceptación está prohibida constitucionalmente. Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1. La Convención Constituyente escogió un área de la intimidad para protegerla al máximo, prohibiendo expresamente la interceptación telefónica, con una prohibición de carácter absoluto. La grabación consensual no fue mencionada ni considerada por la Convención Constituyente.

constituyen el ámbito en que ésta se ha hecho y se mantiene. Toda intromisión sin su permiso en ese círculo privado equivale para todo hombre a una violación de su personalidad. Lo mismo acontece con los medios en que se expresa su intimidad y que reserva tan sólo para algunos: su correspondencia; sus manifestaciones espontáneas a través de los modernos medios mecánicos de comunicación. La lesión de la intimidad es en este sentido el más penoso ataque a los derechos fundamentales de la persona. Segunda Asamblea Legislativa, 1953–1954, Expediente del P. de la C. 1062, O. de A. y D. Cámara de Representantes.

Según se desprende del Informe, la intención legislativa era proteger los derechos constitucionales a la intimidad, a la inviolabilidad de la dignidad del ser humano y la protección a la vida y propiedad, entre otros. Art. II, Secs. 1, 8 y 10, Const. E.L.A., L.P.R.A., Tomo 1.

Mediante la aprobación del artículo aludido se introdujo en Puerto Rico por primera vez una disposición en el Código Penal de 1902 para prohibir la grabación de algún tipo de comunicación. Luego, el 22 de julio de 1974 se aprobó la Ley Núm. 115 (33 L.P.R.A. sec. 3001 *et seq.*) mediante la cual se adoptó el Código Penal actualmente vigente en el cual se amplió el delito en cuestión, tipificándolo como el Art. 145, *supra,* y haciéndolo extensivo a cualquier "comunicación privada personal". Este artículo, al igual que su predecesor, fue aprobado por ambos cuerpos legislativos sin enmiendas ni discusiones. Respecto al Art. 145, *supra,* tampoco hubo informes de comisión. La ausencia de un historial legislativo concreto y adecuado, que nos permita precisar la intención legislativa de este artículo, nos obliga a hacer una excursión en la historia del Código Penal de 1974, en búsqueda de datos que arrojen luz sobre el particular.

### III

Para la aprobación de dicho código se redactaron varios proyectos, entre los cuales se destaca el de Francisco Pa-

gán Rodríguez. Informe del Secretario de Justicia al Gobernador, en *Proyecto del Código Penal*, New Hampshire, Equity Publishing Corp., 1967. El proyecto de Pagán Rodríguez no proponía artículo alguno específicamente equivalente a nuestro actual Art. 145, *supra*, pero sí contenía un artículo en algo parecido, el propuesto Art. 175,([5]) que prohibía, no la grabación en sí sino, más bien, la *divulgación* injustificada de comunicaciones privadas personales. Dicho artículo estaba ubicado bajo la sección titulada "Delitos contra la Inviolabilidad de los Secretos". Íd.

En 1972, y tomando como base el proyecto de Pagán Rodríguez, funcionarios del Departamento de Justicia redactaron otro anteproyecto que contenía un capítulo para la "Protección de la Privacidad". F. Alfaro de Quevedo, *Anteproyecto de Código Penal para Puerto Rico*, San Juan, Departamento de Justicia, Oficina de Justicia Criminal, 1972, pág. 203. En ese capítulo se incluyó una disposición que prohibía la grabación de una *comunicación privada* cuando ésta se hacía con la intención de "alterar, comunicar o usar información".([6]) Íd., págs. 206–207. El Art. 546(b) de ese anteproyecto definía el término "comunicación privada" de la forma siguiente:

(b) "Comunicación privada" incluye cualquier comunicación

---

([5]) "Art. 175. REVELACIÓN DE COMUNICACIÓN PRIVADA

"Cualquiera de las partes intervinientes en una comunicación privada personal, que habiendo grabado la misma, la divulgare sin justa causa y sin consentimiento de las otras partes, sufrirá pena de reclusión hasta seis meses o multa hasta doscientos cincuenta dólares." F. Pagán Rodríguez, *Proyecto de Código Penal para Puerto Rico*, New Hampshire, Ed. Equity, 1967, pág. 62.

([6]) "USO NO AUTORIZADO DE GRABACIÓN

"Artículo 555.— (a) Una persona es culpable de uso no autorizado de un artefacto de grabación cuando con la intención de alterar, comunicar o usar información, dicha persona graba una comunicación privada por medio de un artefacto electrónico amplificador o de grabación sin el consentimiento de todas las partes de dicha comunicación.

"(b) Esta sección será aplicable a comunicaciones privadas llevadas a cabo entre las partes en la presencia de unos y otros o por medio del telégrafo, teléfono u otro artefacto electrónico, mecánico u otro artefacto excepto el radio." F. Alfaro de Quevedo, *Anteprojecto de Código Penal para Puerto Rico*, San Juan, Departamento de Justicia, Oficina, Oficina de Justicia Criminal, 1972, págs. 206–207.

que se lleve a cabo bajo tales circunstancias que *razonablemente indiquen que cualquiera de las partes de dicha comunicación desea que ésta quede entre las partes*, pero excluye cualquier comunicación vertida en una reunión pública o en cualquier procedimiento, legislativo, judicial, ejecutivo o administrativo abierto al público, o bajo cualesquiera otras circunstancias en las que las partes en la comunicación pudieran esperar razonablemente que la comunicación fuere grabada. (Énfasis suplido.) Alfaro de Quevedo, *op. cit.*, pág. 203.

Este anteproyecto, aunque incluía por vez primera la prohibición relativa a grabaciones, la limitaba a "comunicaciones privadas" y nada decía en cuanto al elemento de que fuesen "personal".[7] Sin embargo, de la definición del término "comunicación privada", el anteproyecto dejaba entrever la importancia de la expectativa a la intimidad al requerir como elemento del delito el deseo de cualquiera de las partes a que la conversación quedase entre ellas.

En 1973, el Consejo sobre la Reforma de la Justicia redactó y sometió un anteproyecto en el cual se incluyó un artículo casi idéntico al que hoy nos ocupa. Consejo sobre la Reforma de la Justicia, *Proyecto de Código Penal*, San Juan, 1973, pág. 49. Dicho artículo disponía:

*Grabación*

Artículo 161. —Toda persona que participe en una comunicación privada personal, o cualquier persona extraña a la misma, que grabe dicha comunicación por cualquier medio mec[á]nico o de otro modo sin el consentimiento expreso de todas las partes sufrirá pena de reclusión hasta seis (6) meses o multa hasta quinientos (500) dólares o ambas penas a la discreción del Tribunal.

La procedencia o propósitos de este artículo no aparecen explicados en el anteproyecto. En el prefacio del anteproyecto tampoco se señala las fuentes o modelos que se utilizaron. Sin embargo, en el prefacio del anteproyecto de

---

[7] Según podremos observar más adelante, el artículo propuesto sigue una línea similar a la del *Federal Omnibus Crime Act*, 18 U.S.C. secs. 2510–2520.

1972 se señaló que se había hecho uso, entre otros, del *Proyecto de Código Penal de California de 1972 y del Borrador final del Código Penal federal.* Alfaro de Quevedo, *op. cit.,* pág. 1.

Es generalmente conocido que nuestro Código Penal de 1902 fue calcado del de California de 1873, por vía del Código Penal de Montana.[8] Nuestro Código Penal de 1974 también tomó mucho del de California. La Sec. 632 del Código Penal de California, que es bastante parecida al Art. 145, *supra,* en su inciso (a), dispone:

(a) Every person who, intentionally and without the consent of all parties to a *confidential communication,* by means of any electronic amplifying or recording device, eavesdrops upon or *records the confidential communication,* whether the communication is carried on among *the* parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment. If the person has previously been convicted of a violation of this section or Section 631, 632.5, 632.6, or 636, the person shall be punished by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment. (Énfasis suplido.) Cal. Penal Code Sec. 632(a) (Deering 1983).

El código californiano, contrario al nuestro, contiene una disposición que define el término *confidential communication.* La Sec. 632(c), que es idéntica al propuesto Art. 546(b) del anteproyecto de 1972, dispone:

(c) The term "confidential communication" includes *any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto,* but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other

---

(8) J. Trías Monge, *Discurso Inaugural,* Rev. Acad. de Jur. y Leg., 1:19 (1989).

circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded. (Énfasis suplido.) Cal. Penal Code Sec. 632(c) (Deering 1983).

Luego de examinar los anteproyectos del Código Penal y el P. del S. Núm. 753 de 17 de junio de 1974, proyecto antecesor de la Ley Núm. 115 de 22 de julio de 1974 (33 L.P.R.A. sec. 3001 *et seq.*), y la disposición del Código Penal de California antes citada, nos parece razonable concluir que nuestro Art. 145, *supra,* tiene al menos parte de sus orígenes en California. Y, de lo que hemos reseñado antes, es evidente que el artículo californiano, de su propia faz, incluye el requisito de expectativa a la intimidad como elemento esencial de la definición de las comunicaciones privadas objeto de regulación.

Los tribunales de California han discutido extensamente el alcance de la prohibición dispuesta en la Sec. 632 de su Código Penal. En *People v. Newton,* 116 Cal. Rptr. 690 (1974), se señaló que para determinar si una conversación podía clasificarse como confidencial, a los fines de la Sec. 632, *supra,* era necesario indagar si las partes tenían una expectativa razonable a la intimidad.

En *O'Laskey v. Sortino,* 273 Cal. Rptr. 674, 677 (1990), el caso más reciente que discute este asunto en California, se reiteraron los criterios de la jurisprudencia de ese estado sobre el particular, enfatizando que la expectativa a la intimidad debe ser considerada dentro de un estándar objetivo de razonabilidad. Se expresó allí lo siguiente:

Application of the statutory definition of "confidential communication" turns on the reasonable expectations of the parties judged by an objective standard and not by the subjective assumptions of the parties. (*People v. Wyrick* (1978) 77 Cal.App.3d 903, 909, 144 Cal.Rptr. 38.)

La norma de California sobre la expectativa razonable de intimidad también es la que rige respecto a las disposi-

ciones homólogas de la otra fuente probable de nuestro Art. 145, *supra*: el Código Penal federal. En la esfera federal no existe una legislación que expresamente prohíba las *grabaciones* de algún tipo de comunicación. Sin embargo, el *Federal Omnibus Crime Act*, creado para regular la *interceptación* de comunicaciones, ha sido interpretado como que incluye una prohibición en cuanto a su grabación.[9] La interceptación de comunicaciones se define así:

> (4) "intercept" means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. 18 U.S.C. sec. 2510(4).

El lenguage citado ha dado lugar a que se interprete que el *Federal Omnibus Crime Act* prohíbe tanto la *interceptación* como la *grabación* de comunicaciones telegráficas, electrónicas u "orales". Las comunicaciones orales son definidas en dicha ley federal así:

> (2) "oral communication" means any oral communication uttered by a person *exhibiting an expectation that such communication is not subject to interception* under circumstances justifying such expectation, but such term does not include any electronic communication. (Énfasis suplido.) 18 U.S.C. sec. 2510(2).

Como puede observarse, la definición del término *oral communication* en su esencia es parecida a la que en California se le dió al término *confidential communication*. Aunque el lenguage no es idéntico, ambas definiciones incluyen como elemento esencial la expectativa a la intimidad de los participantes en la comunicación, limitándola a

---

[9] Muchos de los estados de Estados Unidos de América han aprobado leyes que prohíben criminalmente los actos específicos de interceptación o grabación de comunicaciones.

El lenguaje de muchos de estos estatutos siguen exactamente o se aproximan al lenguaje del *Federal Omnibus Crime Act*. Entre estos estados se encuentran Florida y Nueva York. Puerto Rico copió este modelo en el Proyecto realizado por la licenciada Alfaro de Quevedo. Alfaro de Quevedo, *op. cit.*

que las circunstancias justifiquen tal expectativa. *Matter of John Doe Trader Number One*, 894 F.2d 240 (7mo Cir. 1990); *United States v. Harrelson*, 754 F.2d 1153 (5to Cir.), *cert.* denegado, 474 U.S. 908 (1985); *United States v. Pui Kan Lam*, 483 F.2d 1202 (2do Cir. 1973), *cert.* denegado, 415 U.S. 984 (1974); *People v. Santos*, 102 Cal. Rptr. 678, (1972); *People v. Siripongs*, 754 P.2d 1306 (Cal. 1988), *cert.* denegado, 102 L.Ed.2d 810 (1989); *Wilks v. Commonwealth*, 234 S.E.2d 250 (1977). Además, expresamente se ha resuelto que no se violan las disposiciones de la ley federal si no existe una expectativa legítima a la intimidad. *Com. v. Look*, 402 N.E.2d 470, *cert.* denegado, 449 U.S. 827 (1980); *State v. Hauss*, 688 P.2d 1051 (1984).

## IV

 La anterior incursión en los antecedentes del Art. 145, *supra*, nos permite concluir con razonable certeza que la "comunicación privada personal" cuya grabación se prohíbe es aquella respecto a la cual los partícipes tenían una expectativa razonable de que lo comunicado habría de quedar entre ellos; es decir, una expectativa de protección a la intimidad. Esta conclusión está en armonía con el claro propósito legislativo cuando en 1953, por primera vez, se aprobó legislación en Puerto Rico para prohibir la grabación de algún tipo de comunicación. El interés público que se quiso tutelar es la inviolabilidad del círculo privado que constituye una prolongación de la persona. Las manifestaciones espontáneas de un ser humano en su contorno privado son tan parte de sí como lo son la propia persona, el hogar, la correspondencia, la vida privada o familiar, y los libros, papeles o efectos personales. Todos gozan en nuestro ordenamiento jurídico de la fundamental protección contra intromisión indebida que garantiza el derecho constitucional a la intimidad. Const. E.L.A., *supra*; *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978); *E.L.A. v. Hermandad de Em-*

*pleados*, 104 D.P.R. 436 (1975); *García Santiago v. Acosta*, 104 D.P.R. 321 (1975); *Cortés Portalatín v. Hau Colón*, 103 D.P.R. 734 (1975). El Art. 3 de la Ley Núm. 66, *supra*, vigente antes, y el Art. 145 del Código Penal, *supra*, vigente ahora, dimanan del mandato constitucional y encuentran en dicho mandato su razón de ser, su sentido y los límites de su alcance.

Debe notarse que la aludida protección a la comunicación privada personal no ha sido de ordinario un interés jurídico tutelable en ausencia de normas reconocidas que garanticen algún derecho a la intimidad. Lo ordinario ha sido que una persona que participa en una conversación puede repetir *ad verbatim* lo que se ha dicho en ella. La persona que voluntariamente entra en una conversación con otra se corre el riesgo de que ésta memorice y luego divulgue dicha conversación. Y si la puede recordar y revelar sin restricciones, parecería que también la puede grabar. En *Katz v. United States*, 389 U.S. 347, 363n. (1967), el Hon. Juez Byron White, en una opinión concurrente, señaló:

> When one man speaks to another he takes all the risks ordinarily inherent in so doing, including the risk that the man to whom he speaks will make public what he has heard ... . It is but a logical and reasonable extension of this principle that a man take the risk that his hearer, free to memorize what he hears for later verbatim repetitions, is instead recording it or transmitting it to another.

En *United States v. DeVore*, 423 F.2d 1069, 1074 (4to Cir. 1970), un tribunal federal expresó el principio en la forma siguiente:

> When a defendant has a conversation with another person he relinquishes his right of privacy with respect to that person. He may constitutionally complain of breach of privacy by an eavesdropper, but not of a breach of trust by the person he chooses to trust, however unwisely. Since the participants in a conversation are privileged to tell what was said, it necessarily must

follow that a recording of what was said may either be used to corroborate the revelation, or simply as a more accute [sic] means of disclosure.

En efecto, en el ámbito federal se ha permitido, y se sigue permitiendo, que una persona que es parte en una conversación, del tipo que sea, grabe ésta sin el consentimiento de ninguna otra de las personas participantes. La única limitación que se tiene, la cual surge del *Federal Omnibus Crime Act*, 18 U.S.C. sec. 2511(2)(d), es que dicha grabación no se realice con propósitos ilícitos.[10] Esto es, independientemente de la expectativa legítima a la intimidad que tenga alguna o todas las partes en una conversación, cualquiera de ellas la puede grabar si no tiene propósitos criminales o torticeros. En el ámbito federal, pues, donde no exista un derecho constitucional a la intimidad del alcance del nuestro, una persona que voluntariamente entra en una conversación con otra se corre el riesgo de que ésta se memorice, grabe o transmita dicha conversación. *Pearson v. State*, 556 P.2d 1025 (1976); *López v. United States*, 373 U.S. 427 (1963); *Hoffa v. United States*, 385 U.S. 293 (1966); *People v. Canard*, 65 Cal. Rptr. 15, *cert.* denegado, 393 U.S. 912 (1968).

Junto con nuestros señalamientos sobre el historial legislativo del Art. 145, *supra*, la discusión anterior explica por qué no podemos concluir, como nos sugiere el Ministerio Público, que dicho Art. 145 prohíbe en términos absolutos cualquier grabación de comunicaciones privadas personales.[11] Para que la prohibición de dicho artículo

---

[10] "(d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution of laws of the United States or of any State." 18 U.S.C. sec. 2511(2)(d).

[11] No le asiste la razón al Ministerio Público al pretender aplicar la doctrina adoptada en *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328 (1983). En aquel caso este Tribunal estaba interpretando una prohibición constitucional que parecía absoluta y

tenga sentido, es menester que exista entre los que se comunican una expectativa a la intimidad y esa expectativa tiene que ser razonable.

## V

A la luz de los pronunciamientos anteriores, debemos decidir ahora si en este caso, conforme a sus hechos, existía una expectativa razonable a la intimidad que por intromisión con ésta convierta en delictiva la conducta del acusado. Según surge de la exposición narrativa de la prueba, el Prof. Hugo Burgos, que como jefe del departamento académico a que pertenecía el acusado, tenía la encomienda de dirigir la evaluación de éste, declaró que el propósito de hacer privada la reunión de evaluación era proteger al acusado De León, para que éste se sintiera en confianza y para asegurarse de que los asuntos que se traerían allí no llegaran a oídos de los estudiantes o de otros profesores. Admitió que durante la reunión no se había hablado sobre la vida privada de ninguno de los presentes.

La Prof. Delia Márquez, miembro del comité de evaluación, declaró que la comunicación entre los miembros del comité era privada por ser la reunión a puertas cerradas y porque nadie tenía por qué escuchar las conversaciones entre ellos, por "razones de ética" y por tratarse de "cuestiones" del profesor De León de las cuales nadie más tenía por qué enterarse.

El acusado De León, a su vez, declaró que el día de la evaluación notó al profesor Burgos muy nervioso y que

---

aun así ésta se limitó a las conversaciones consentidas o lícitas. En el recurso ante nos la prohibición es estatutaria y está expresamente dirigida a las conversaciones privadas personales.

No expresamos criterio alguno sobre si el Art. 145, *supra*, incluye o no conversaciones privadas personales sobre asuntos comerciales. En *P.R. Tel. Co. v. Martínez*, supra, en otro contexto, se indica que las conversaciones allí protegidas incluyen las "familiares, amistosas o *comerciales*". Por no estar el asunto ante nos, no expresamos criterio alguno sobre el particular.

tuvo la creencia de que sus compañeros claustrales no serían objetivos en su evaluación debido a la acción civil que él había presentado antes contra la institución, y debido a que él tenía una preparación académica superior a la de los evaluadores. Declaró, además, que su propósito al grabar las conversaciones en cuestión era tener evidencia de su asistencia y participación en dicha evaluación. También declaró que durante todo el tiempo que duró la evaluación nadie le hizo preguntas sobre su vida personal o familiar y nadie habló de sus asuntos personales, familiares o íntimos.

Como puede observarse, no existen en este caso fundamentos suficientes para concluir que los otros participantes en la reunión de evaluación del profesor De León tuviesen una expectativa razonable de intimidad. Según las declaraciones de los propios profesores Burgos y Márquez, la reunión se celebró a puerta cerrada para proteger la intimidad del acusado y no la propia. Más aún, los asuntos discutidos no trataron sobre cuestiones entrañables o íntimas de ninguno de los participantes. No eran asuntos "personales privados", según el significado corriente de esos conceptos. La reunión era parte de un procedimiento administrativo universitario, análogo a la evaluación del personal de servicio público, que por su propia naturaleza trata con temas y asuntos que son de conocimiento general en el ámbito claustral, propios para discutirse abiertamente.

De ordinario, la evaluación de la ejecutoria de un profesor universitario gira en torno a factores tales como la calidad de la enseñanza que imparte y de las investigaciones que realiza; la dedicación a las labores y al servicio universitario; el cumplimiento de los deberes docentes; las actividades y esfuerzos de mejoramiento profesional que realiza; los reconocimientos recibidos, y las opiniones fundamentadas de los estudiantes y de los compañeros de trabajo. Ninguno de éstos son asuntos que propiamente pueden considerarse "privados" o "íntimos", cuya dilucidación deba

hacerse secretamente. Por el contrario, existen razones de peso, relativas a la libertad académica, que sugieren que estos procedimientos de evaluación deben conducirse a la luz pública,(12) para que el profesor sea evaluado por la calidad de lo que enseña y no por sus creencias personales; para que se le juzgue por el rigor de su profesionalismo y no por el contenido ideológico de lo que discute con los estudiantes.

Propiamente concebidos, los procesos de evaluación claustral son parte integral del desarrollo profesional del profesor. No se realizan meramente para decidir sobre ascensos o sobre la permanencia del claustral, sino para promover y facilitar el mejoramiento de sus destrezas educativas e investigativas. Los informes que se rinden son de gran valor no sólo a las juntas y autoridades universitarias que deciden las cuestiones de ascenso o permanencia, sino al propio profesor que desea superarse. Todo este complejo proceso educativo se prostituye si no se conduce al nivel de altura que es propio en una institución académica; se distorsiona si tiene que realizarse furtiva o subrepticiamente. No es éste, ciertamente, el ámbito propio para las protecciones que dimanan del derecho a la intimidad.

■ Todo lo antes dicho, visto en conjunto, nos lleva ineludiblemente a concluir que el único que acaso podía tener una expectativa a la intimidad era el acusado, Héctor De León Martínez. Al ser precisamente él quien grabó las conversaciones sostenidas durante la reunión, renunció a cualquier derecho a la intimidad que pudiese tener. En otras palabras, si para alguien la aludida reunión de evaluación era "privada personal", lo era para el acusado. Los

_____

(12) No sugerimos que tales procedimientos deban estar abiertos al público en general. Más bien, intimamos que debe haber algún récord de los procedimientos; que deben ser asequibles a partes interesadas; que deben ser informados a la comunidad universitaria, y otros requisitos de índole similar.

Sobre el alcance de la revisión judicial en casos de evaluación de profesores, véase *Selosse v. Fund. Educ. Ana G. Méndez*, 122 D.P.R. 534 (1988).

profesores que se querellaron por la grabación no tenían expectativa legítima a la intimidad alguna que este Tribunal deba proteger. Su intimidad no fue violada por haberse grabado sus expresiones.

La actuación del acusado puede parecer impropia y de mal gusto. Ciertamente, no fue cónsona con el espíritu de respeto y consideración recíproca que debe prevalecer en procesos de esta naturaleza. Y es lamentable que el profesor se sintiera intimidado a tal grado que optó por grabar secretamente las conversaciones sostenidas durante la reunión. Pero nada de esto justifica considerar que el profesor acusado cometió un delito que deba castigarse con reclusión carcelaria. Resolvemos, pues, que no se violó el Art. 145 del Código Penal, *supra*.

## VI

Pasemos a examinar el segundo error señalado.

En la discusión del segundo error el apelante hace tres (3) señalamientos: que el tribunal no le concedió el beneficio de la duda razonable; que no se probó la presencia de "mujeres y niños" por lo que, presumiblemente entiende que no se configuró o probó el delito; que la perjudicada estaba exaltada, por lo que no se le podía alterar la paz.

Es principio fundamental de nuestro sistema de derecho que la culpabilidad de un imputado de delito debe ser probada más allá de duda razonable. *Pueblo v. Ortiz Morales*, 86 D.P.R. 456 (1962); *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545 (1974); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986). Esta máxima es consustancial con el principio de presunción de inocencia y es un elemento del debido proceso de ley. *Pueblo v. Cruz Granados*, 116 D.P.R. 3 (1984). Para cumplir con este requisito se requiere que la prueba presentada sea "suficiente en derecho" lo que significa que la evidencia presentada tiene que producir certeza

o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Carrasquillo Carrasquillo*, supra; *Pueblo v. Rodríguez Román*, 128 D.P.R. 121 (1991). La insatisfacción con la prueba es lo que se conoce como duda razonable y fundada. *Pueblo v. Toro Rosas*, 89 D.P.R. 169 (1963); *Pueblo v. Cabán Torres*, supra.

La determinación de que se ha probado la culpabilidad más allá de duda razonable es revisable en apelación como cuestión de derecho. *Pueblo v. Serrano Nieves*, 93 D.P.R. 56 (1966); *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981). Cuando un análisis ponderado de la prueba desfilada ante el foro de instancia nos produce duda razonable y fundada sobre si la culpabilidad del apelante ha quedado establecida más allá de duda razonable, este Tribunal no ha vacilado en dejar sin efecto un fallo condenatorio. *Pueblo v. Cabán Torres*, supra, pág. 657; *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988). Pasemos, pues, al análisis de la prueba.

A. El apelante impugna la credibilidad de los profesores Burgos y Márquez por haber sido éstos los únicos testigos de cargo en la acusación por agresión, de la cual el apelante fue exonerado, pero no podemos basar nuestra evaluación de su apelación sobre este hecho. Que el juzgador de los hechos no haya creído el testimonio referente a la agresión no impide necesariamente que se crea su testimonio en cuanto a la alteración a la paz. Ambos actos constituyen delitos distintos y requieren elementos distintos. Ya hemos establecido antes que no es necesario rechazar toda la declaración de un testigo porque este se haya contradicho o faltado a la verdad respecto a uno o más particulares. En otras palabras, es imprescindible armonizar toda la prueba y analizarla en conjunto a los fines de arribar al peso que ha de concedérsele a la prueba en su totalidad. *García Rivera v. Tribunal Superior*, 86 D.P.R.

823 (1962); *Pueblo v. López Rivera*, 102 D.P.R. 359, 366 (1974); *Pueblo v. Cruz Negrón*, 104 D.P.R. 881, 883 (1976).

Los testimonios de los testigos de cargo fueron coincidentes en cuanto a que el acusado profirió frases insultantes hacia la persona de la profesora Márquez. Hasta los testigos de la defensa coincidieron en que hubo alteración de ambas partes. Este hecho nos lleva a concluir que no erró el tribunal de instancia al conferir credibilidad a los testigos de cargo en cuanto a la proliferación de insultos por parte del acusado.

B. La denuncia objeto de este planteamiento disponía:

> El referido acusado Héctor De León Martínez, allí y entonces, ilegal, voluntaria, maliciosa y criminalmente a sabiendas en la fecha, hora y sitio antes indicado y con la intención criminal le alteró la paz y tranquilidad a la Sra. Delia Marques Espinet, haciendo uso de un lenguaje grosero, profano e indecoroso y *en presencia y al alcance de mujeres y niños* y dirigiéndose a esta le dijo "So mediocre, lambe ojo" *dando lugar a que por tal conducta tan desordenada le alterara la paz y tranquilidad a los allí presentes y en especial a la perjudicada* a quien iba dirigidas dichas frases ofencivas. (Énfasis suplido.)

Alega el apelante que a pesar de haberse alegado en la denuncia que el lenguaje se utilizó al alcance de mujeres y niños, no se probó la presencia de éstos. En su escrito de oposición, el Ministerio Fiscal acepta que no se pasó prueba tendente a demostrar la presencia de mujeres o niños en el lugar de los hechos. Sin embargo, ese hecho por sí sólo no dispone de lo alegado ante nosotros. La ausencia de esa prueba solamente nos lleva a resolver que tal modalidad del delito no se configuró.

 Este Tribunal ha establecido que basta con que se cometa uno de los actos ilegales para que el delito se entienda consumado. *Pueblo v. Matos Pretto*, 93 D.P.R. 113 (1966). En las últimas líneas de la denuncia en cuestión también alega la configuración del delito según se dispone

en el inciso (a) del citado artículo.[13] A los efectos de esta modalidad del delito no es necesario alegar en la acusación o denuncia, ni probar, que las frases fueron proferidas al "alcance de los oídos de mujeres o niños". Art. 260 del Código Penal, *supra*.

C. Alega el apelante que la perjudicada, según declarado por ella misma, se encontraba nerviosa o exaltada desde el inicio de la reunión, razón por la cual era imposible alterarle la paz. Además de esto, señala el apelante que la perjudicada profirió frases insultantes y ofensivas contra el acusado, participando y contribuyendo a la turbación de su paz.

Es un elemento básico, implícito y reconocido desde el 1921, que para que el delito de alteración a la paz se configure, el o los perjudicados deben estar en paz.[14] Por "paz" se entiende la tranquilidad de que gozan los ciudadanos cuando reina buen orden. *El Pueblo v. Ruiz*, 29 D.P.R. 74 (1921).

La prueba en este caso no es clara en cuanto a quién provocó los insultos de quién o, mejor dicho, quién comenzó la discusión. Podríamos decir más bien que hay ausencia de tal evidencia. *El acusado ofreció en evidencia la grabación tomada por éste, en la cual constaba el inicio de tal*

---

[13] El Art. 260 del Código Penal, *supra*, dispone:

"Será sancionada con pena de reclusión que no excederá de seis (6) meses o multa que no excederá de quinientos dólares o ambas penas a discreción del tribunal toda persona que voluntariamente realizare cualesquiera de los siguientes actos:

"(a) Perturbare la paz o tranquilidad de algún individuo o vecindario, con fuertes e inusitados gritos, conducta tumultuosa u ofensiva o amenazas, vituperios, riñas, desafíos o provocaciones.

"(b) Disparare en la calle o vía pública algún arma de fuego, o que sin ser un caso de legítima defensa, sacare o mostrare en presencia de dos o más personas algún arma mortífera, en actitud violenta, colérica o amenazadora o que de modo ilegal hiciere uso de dicha arma en alguna riña o pendencia.

"(c) Hiciere uso de lenguaje grosero, profano o indecoroso en presencia o al alcance del oído de mujeres o niños, en forma estrepitosa o inconveniente."

[14] Este elemento fue reconocido en *El Pueblo v. Ruiz*, 29 D.P.R. 74 (1921), en una interpretación que hiciese este Tribunal del Art. 368 del Código Penal, predecesor de nuestro Art. 260, *supra*.

*discusión, y tal grabación no fue admitida.* Este hecho no tendría importancia si se tratara de la paz de un sector público o de la comunidad. Sin embargo, en el caso ante nos se señala como única perjudicada a la profesora Márquez. La necesidad de que la perjudicada se encontrase en paz y que el acusado iniciara los insultos, es imperativo de nuestro ordenamiento jurídico criminal.

El profesor Burgos, testigo de cargo, declaró que tanto él como la profesora Márquez se molestaron muchísimo al percatarse de que los estaban grabando. Además, admitió haberle dicho "energúmeno", "sinvergüenza" al acusado y que había estudiado "en una escuelita de viernes a sábado". Con respecto a la profesora Márquez, el testigo de cargo declaró que ésta le había dicho "mediocre" y "yo tengo pantalones como tú, echa pa'lante" al acusado. La profesora Márquez declaró no recordar ese incidente.

El profesor Balzac, otro de los evaluadores y testigo que fue renunciado por el Fiscal, declaró que hubo comentarios hirientes de ambas partes y que la profesora Márquez le dijo "mediocre" y "sinvergüenza" al acusado, *a lo que éste respondió.* El profesor Moura declaró que hubo voces alteradas, entre ellas la del profesor Burgos.

La lectura integral de la exposición narrativa de la prueba, certificada como correcta por el tribunal de instancia, nos lleva a concluir que la prueba presentada por el Estado en el presente caso —aun de merecer crédito— es insuficiente para sostener la convicción decretada contra el apelante por el delito de alteración a la paz. Surge de ella que hubo insultos y provocación de parte y parte. No surge de la exposición narrativa que la perjudicada profesora Márquez estuviese en paz y que fuese el acusado quien inició los insultos. El análisis integral de la prueba no nos permite concluir más allá de toda duda razonable que el acusado haya sido el que iniciase la agria discusión que ocurrió entre las partes de este caso. Luego de examinar la exposición narrativa de la prueba, nos queda insatisfacción que perturba nuestro sentido de justicia.

Por las razones expuestas, *se revocará la sentencia que declaró culpable al acusado en el presente caso.*

El Juez Asociado Señor Rebollo López disintió sin opinión escrita.