ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br><br>V.<br><br><br>MILDRED MALDONADO LIND<br><br>Apelante | KLAN202500361 | *Apelación*<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Guayama |
|---|---|---|
| | | Civil Núm.:<br>GLE2023-0053 AL 0055<br>GLE2022-0082<br><br>Sala: 305 |
| | | SOBRE:<br>Art. 5.07 (B), 4.02 y 7.06 de la Ley 22 (2000) |

Panel integrado por su presidente, el juez Hernández Sánchez,[1] el juez Salgado Schwarz y el juez Monge Gómez.

Salgado Schwarz, Carlos G., Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico a 18 de febrero de 2026.

Comparece la Sra. Mildred Maldonado Lind (señora Maldonado Lind o la apelante) y solicita la revocación de la Sentencia de reclusión impuesta el 4 de abril de 2025, por el Tribunal de Primera Instancia Sala de Ponce (TPI o foro primario), así como del veredicto de culpabilidad emitido el 19 de febrero de 2025, ante el foro primario, en los casos con designación alfanumérica GLE2023G0053, GLE2023G0054 y GLE2023G0055, por infracción a los artículos 5.07 (B), 7.06 y 4.02 de la *Ley de Vehículos y de Tránsito Puerto Rico*, 9 LPRA secs. 5001-5727 (Ley Núm. 22-2000).

Por los fundamentos que expondremos a continuación confirmamos la Sentencia apelada.

---

[1] Mediante Orden Administrativa OATA-2025-068 del 7 de mayo de 2025 se designa al Hon. Juan R. Hernández Sánchez en sustitución del Hon. Félix R. Figueroa Cabán para entender y votar.

**-I-**

Por hechos ocurridos el 27 de junio de 2021, el Ministerio Público presentó tres acusaciones en contra de la señora Maldonado Lind por infracciones a los Artículos 5.07(B), 7.06 y 4.02 de la *Ley de Vehículos y de Tránsito Puerto Rico*, 9 LPRA secs. 5001-5727 (Ley Núm. 22-2000). En síntesis, se acusó a la apelante, de que mientras conducía un vehículo de motor bajo los efectos de bebidas embriagantes, impactó al Sr. Bernardo Héctor Ocasio Morales (señor Ocasio Morales, o el perjudicado), quien transitaba en una motora; le ocasionó grave daño corporal y posteriormente abandonó el lugar del accidente.

El juicio ante Jurado comenzó el 31 de julio de 2023 y culminó el 19 de febrero de 2025. Durante el juicio, el Jurado tuvo la oportunidad de evaluar múltiples *exhibits* que formaron parte de la prueba documental, así como el testimonio de varios testigos, entre estos civiles, personal médico y agentes del orden público.

A continuación, ofrecemos un resumen de los testimonios relevantes vertidos en el juicio del caso que nos ocupa, y que hemos examinado con detenimiento.

**Testimonio del Sr. Bernardo Héctor Ocasio Morales (el perjudicado)**

El testigo declaró que el 27 de junio de 2021, salió a correr motora junto a compañeros y amigos; que salieron de Arroyo alrededor de las 2:00 p.m. y se dirigieron por la carretera número 3 hasta el negocio Las Ochenta, en Salinas.[2] Indicó que posteriormente, alrededor de las 6:00 p.m., salieron en dirección a Arroyo y se detuvieron en el Malecón.[3] Agregó que permanecieron en ese lugar aproximadamente

---

[2] *Transcripción de la Prueba*, pág.7, líneas 21-30, pág. 8, líneas 5-6, 24.
[3] *Id*. pág.9, líneas 24-27

cuatro horas y media, tras lo cual decidió dirigirse a su casa.[4] El testigo declaró que conducía por el centro del carril derecho, que esa noche no estaba lloviendo y que el área contaba con tendido eléctrico que iluminaba la vía.[5] Señaló que al llegar a una intersección que le quedaba a mano derecha, observó venir un vehículo desde "dos luces adentro".[6] Añadió que notó que el vehículo no se detuvo, por lo que aplicó los frenos, pero ya se encontraba dentro de la intersección cuando el vehículo le impactó su motora por el lado frontal derecho.[7] Señaló que al momento del accidente conducía aproximadamente entre 30 y 35 millas por hora, que llevaba casco, gafas de seguridad claras y guantillas.[8] Declaró además, que la motora resultó pérdida total.[9] Afirmó que lo próximo que recuerda luego del impacto fue haberse levantado en el Centro Médico.[10] Manifestó que, al despertar, tenía veintiocho (28) puntos de sutura en la cabeza, que no podía abrir mucho los ojos, que las piernas estaban negras, que tenía un foly puesto y que casi no podía hablar.[11] Añadió que como consecuencia del accidente fue sometido a una operación en la que le colocaron una varilla y un tornillo en la pierna.[12] Indicó que, después de la operación, no podía caminar y que permaneció en cama entre tres (3) meses y medio a cuatro (4) meses.[13] Añadió que tuvo que recibir terapias para poder recuperar control y uso de la pierna.[14] Finalmente atestiguó que todavía presenta lagunas en su memoria y que a veces tiene "flashbacks" de ese día, y que continúa bajo tratamiento psicológico para fortalecer su capacidad de memoria.[15]

**Testimonio de la Sra. Jamie Lee De la Madrid Hernández**

La señora Gil de la Madrid Hernández declaró que el 27 de junio de 2021, alrededor de las 11:30 de la noche, se encontraba en el negocio La Terraza de Chiqui, en Patillas con su familia y que cuando se disponían a retirarse

---

[4] *Id*. pág.10, línea 12; pág.11, líneas 6-7.
[5] *Id*. pág. 12, líneas 15-27.
[6] *Id*. pág.13, líneas 22-25.
[7] *Id*. pág. 13, líneas 28-30; pág. 14, líneas 1-11.
[8] *Id*. pág.18, líneas 3-31.
[9] *Id*. pág.19, línea 19.
[10] *Id*. pág.15, líneas 5-8.
[11] *Id*. pág.15, líneas 26-30.
[12] *Id*. pág.16, líneas 8-9
[13] *Id*. pág. 16, líneas 22-26
[14] *Id*. pág.16, líneas 26-29.
[15] *Id*. pág. 45, líneas 21-24.

del lugar, escuchó a varias personas decir que habían impactado a alguien y que había una persona en el pavimento por lo que salió del a verificar y al salir, observó a una persona tirada en el pavimento; que se dirigió hacia él; que junto a otra persona, le acomodaron la cabeza y que este presentaba mucho sangrado. Testificó que llamó al 911 para informarlo y que mientras atendía al joven, escuchó a varias personas gritar "es ella, es ella" y que no se fuera nadie del lugar. La testigo declaró que observó un vehículo que entendió estaba intentando retirarse del lugar del accidente; que el vehículo se fue y ella no lo volvió a ver y que la ambulancia no llegaba, por lo que varias personas tomaron la decisión de trasladar al joven al hospital más cercano.[16]

### Testimonio de la Sra. Irma R. Díaz Rivera

La testigo declaró que el 27 de junio de 2021, alrededor de las 11:30 de la noche, mientras se encontraba en el negocio La Terraza de Chiqui, en Patillas escuchó un ruido fuerte, por lo que su esposo y hermana salieron a verificar lo que ocurrió mientras ella permaneció en la mesa con unos menores hasta que su hermana regresó y le dijo que había un muchacho tirado en el piso. Entonces la testigo indicó que salió rápidamente hacia el lugar y testificó que, al llegar donde estaba el caballero tirado en la carretera, ya había una joven con él. Señaló que se identificó como enfermera; que se acercó al perjudicado y que entre ella y la otra joven, le acomodaron la cabeza para que pudiera respirar mejor. Añadió que mientras levantaban al lesionado, pudo observar un vehículo más abajo, hacia el cual la gente gritaba "se va, se va". Sobre estos extremos, la testigo declaró que escuchó a las personas gritar y vio que le lanzaban latas y objetos al vehículo y que el carro estaba dando reversa hacia la intersección del negocio Los Pollos. Expresó que varios jóvenes montaron al lesionado en una pickup y lo entregaron finalmente al personal de enfermería del hospital de Guayama, tras llegar al CDT de Patillas y encontrarlo cerrado.[17]

---

[16] *Id*. pág. 26-71.
[17] Transcripción de la Prueba Oral, págs. 99-105.

### Testimonio del Sr. José R. De Jesús Cora (señor De Jesús Cora)

El señor De Jesús Cora declaró que el 27 de junio de 2021 se reunió con el señor Ocasio Morales y otros dos amigos en el sector Las Quinientas y salieron hacia Las Ochenta, en Salinas; que luego se dirigieron al negocio La Terraza de Chiqui; que al llegar, se bajó de la motora, compró una cerveza y salió afuera a fumar, sentándose en su motora frente al negocio. Testificó que vio al señor Ocasio Morales mientras transitaba por la vía principal frente al negocio. Acto seguido, observó que un vehículo no se detuvo en el "pare" de la intersección e impactó la motora del perjudicado Describió que el vehículo impactó la motora por la parte frontal, lo que provocó que el señor Ocasio Morales saliera expulsado y cayera en el pavimento. El testigo declaró que corrió "hacia el vehículo por la puerta del conductor y le preguntó a la persona que estaba dentro, la apelante, si se encontraba bien. Afirmó que esta no le contestó, que lo miró pero que permaneció como si nada. Entonces el testigo expresó que se dirigió hacia el señor Ocasio Morales, le colocó el brazo debajo del cuello, observó que estaba sangrando, le removió el casco y que llegó un grupo de personas, entre ellas, la señora Díaz Rivera.

En lo referente al vehículo, el testigo declaró que se percató de que comenzó a dar reversa mientras él se encontraba moviendo personas del área; que la gente comenzó a gritarle que no se fuera, que se detuviera, pero que el carro dio reversa por la intersección, viró y se fue por donde había venido. Acto seguido, el testigo añadió que varios compañeros que estaban en motora y "fourtrack" salieron detrás del vehículo, gritándole que se detuviera, pero luego regresaron sin saber hacia dónde dirigió.[18]

### Testimonio del Dr. Pedro Cádiz Miranda (doctor Cádiz Miranda)

El Dr. Cádiz Miranda declaró que es médico de profesión; que se encontraba de turno el 27 de junio de 2021 en la sala de emergencias del Hospital Menonita de Guayama; que el señor Ocasio Morales llegó al Hospital Menonita el 28 de "junio de 2021 a las12:07de la

---

[18] *Id.* págs. 126-135.

madrugada; que este llegó a Sala de Emergencias con una herida en la cabeza, dolor en la cadera y en otras partes del cuerpo. Describió la fractura del fémur como conminuta, comparándola con un hueso triturado en múltiples fragmentos por el trauma, lo que hacía poco probable que pudiera resolverse allí. Declaró que el perjudicado fue transferido al Centro Médico a las 4:34 de la mañana.[19]

## Testimonio del Dr. Edwin Lugo

El doctor Lugo declaró que se dedica a la cirugía ortopédica; que trabaja en el Centro Médico desde el año 1990; que es facultativo del Departamento de Ortopedia adscrito al Recinto de Ciencias Médicas de Puerto Rico y que intervino quirúrgicamente al señor Ocasio Morales en la pierna derecha, específicamente en el fémur, en una cirugía en la que se le implantó una varilla intramedular. Durante su testimonio el testigo expresó que el perjudicado fue internado el 28 de junio de 2021 a las 8:14 de la mañana, luego de haber sufrido un accidente de motora en el que fue impactado por un vehículo la noche del 27 de junio de 2021, siendo transferido desde el área de Menonita al Centro Médico. Sobre las lesiones, señaló que, con relación a la cabeza, el paciente presentó una herida y un hematoma que no requirieron cirugía; que en la pierna derecha se le implantó una varilla intramedular, que describió como un metal que se coloca dentro del hueso. Afirmó que los daños corporales observados eran compatibles con la versión de que se trató de un accidente de motora.[20]

## Testimonio del Ing. Francisco Márquez Martínez

Declaró que es ingeniero licenciado y que labora para el Departamento de Transportación y Obras Públicas ("DTOP") desde julio de 2023; que, por orden del tribunal, emitió una Certificación relacionada con la fecha del 27 de junio de 2021 sobre la señalización de "PARE" existente en la intersección de referencia. Explicó que se trata de la intersección entre la carretera PR-757 y la carreteraPR-3, en el kilómetro 124.1 del municipio de Patillas y la PR-3 es la vía

---

[19] *Id*. págs. 150-158.
[20] *Id*. págs. 49-54.

primaria y la PR-757 es la vía secundaria en esa intersección. En cuanto a la rotulación, el testigo explicó que se trata de una intersección en forma de "T" y que, en la PR 157, existen dos señales de "PARE", una para quienes van a girar a la derecha hacia la PR-3 y otra para quienes van a girar a la izquierda para acceder a la misma carretera principal.[21]

### Testimonio del Agente. Juan G. Pacheco Ramos (agente Pacheco Ramos")

El agente Pacheco Ramos declaró que está adscrito a la división de patrullas de carretera en Guayama y que lleva veintiún años en la Policía. Sobre sus funciones en tránsito, el testigo expresó que en patrullas de carreteras, interviene con casos de estado de embriaguez e investiga accidentes graves y fatales. El agente Pacheco Ramos afirmó que en el año 2017 tomó el adiestramiento para operar el Intoxilyzer 9000, el cual requirió un examen teórico y uno operacional en el que se simula la 1,89 administración de una prueba de alcohol% Indicó que aprobó ambos y, como resultado, se le otorgó una licencia de operador que lo facultaba a operar el Intoxilyzer 9000, el 5000N y el alcosensor. Enfatizó que esa licencia le fue expedida el 23 de mayo de 2017 y vencía el 23 de mayo de 2021. Declaró que a esos fines declaró que volvió a tomar el adiestramiento en enero de 2023 y que fue el mismo adiestramiento que había tomado en 2017, sin cambios, incluyendo el mismo examen y funcionamiento del instrumento. Añadió que en 2023 el Departamento de Salud le expidió una nueva licencia de operador, expedida el 25 de enero de 2023. Indicó que lleva alrededor de ocho (8) años operando el Intoxilyzer 9000 y que lo ha operado en el cuartel de Patrullas de Carretera en Guayama, en el Distrito de Patillas y en la División de Autopistas de Salinas.

El agente Pacheco Ramos destacó que, cuando interviene con una persona bajo aparente estado de embriaguez, la traslada a la División, se toman sus datos personales y, se mantiene a la persona bajo observación por veinte (20) minutos para asegurar que no se eche nada en la boca. Explicó que luego le muestra cómo soplar correctamente, utilizando

---

[21] *Id.* págs. 242-250.

una boquilla nueva y sellada; ingresa la información personal en la máquina y el instrumento realiza una verificación de aire ambiental para detectar contaminación. Así, aclaró que el adiestramiento establece nueve pasos operacionales previos a realizar la prueba y que, sino se siguen correctamente, la máquina no permite continuar ni realizar la prueba.

Sobre el día de los hechos, el agente Pacheco Ramos afirmó que para el 27 de junio de 2021 laboraba en Patrullas de Carretera de Guayama; que a las 11:21 p.m., le informaron por radiocomunicación que había ocurrido un accidente de auto con motora en el distrito de Patillas y que, al saber que el motociclista había sido transportado al Hospital Menonita de Guayama, se dirigió primero al hospital. Relata que, en la Sala de Trauma, observó al señor Ocasio Morales acostado en una camilla, cubierto casi hasta el pecho con una sábana blanca, con sangre en la parte posterior de la cabeza. El agente Pacheco Ramos afirmó que en ese momento no ordenó prueba de alcohol al señor Ocasio Morales porque, según pudo observar, este no presentaba características de estar en estado de embriaguez: no olía a alcohol, contestó las preguntas, no tenía los ojos rojos y no presentaba pesadez al hablar. Expresó que luego se dirigió al lugar del accidente en Patillas y, allí, un compañero le informó que había una persona arrestada relacionada al accidente, por lo que se transportó al distrito de Patillas.[22]

**El agente Pacheco Ramos atestiguó que en el distrito de Patillas se entrevistó con la sargento González Cora, quien le informó que tenían una arrestada relacionada al accidente y que estaba en estado de embriaguez, por lo que le solicitó que le realizara la prueba de alcohol.[23]**

**El testigo declaró que fue al cuarto donde estaba el Intoxilyzer 9000 y allí se encontraba la señora Maldonado Lind bajo arresto; <u>que percibió un fuerte olor a alcohol, que se sentía tan pronto entró al cuarto. Añadió que, además de percibir el fuerte olor a alcohol, observó que la señora Maldonado Lind exhibía ojos rojos, pesadez al hablar y tardanza en contestar preguntas.</u> [24]**

---

[22] *Transcripción de Prueba Oral,* págs. 266-283.
**[23] *Íd.*, pág.284, líneas 9-20**
**[24] *Id*. pág. 286- líneas 1-9. y pág. 337, líneas 7-11**

**En cuanto a la prueba de aliento, agente Pacheco Ramos testificó que mantuvo a la señora Maldonado Lind bajo observación por veintiocho (28) minutos antes de administrar la prueba y que, concluido el periodo de observación, la colocó frente a la máquina, le explicó el proceso y le mostró una boquilla nueva y sellada.**[25] Reiteró que, antes de la prueba, debía seguir los nueve pasos operacionales.[26] El testigo describió que el procedimiento incluía insertar la tarjeta de récord de prueba en la impresora, presionar el botón de inicio, ingresar la información del agente, luego la información de la persona arrestada, realizar un "datareview", y permitir que el equipo hiciera un "airblank" para verificar el ambiente.[27] Relató que después, la máquina indica que la persona sople, se coloca la boquilla, se le instruye que sople fuerte y constante, y, luego de la muestra, el instrumento realiza otro "airblank" antes de imprimir el resultado.[28] Indicó que siguió los nueve pasos y que, de no completar los o hacerlos mal, la máquina no permite realizar la prueba.[29] **El testigo declaró que la señora Maldonado Lind arrojó una "concentración de alcohol de 0.213.1.**[30]

**Durante su testimonio el agente Pacheco Ramos reconoció que para el 28 de junio de 2021 no tenía una licencia vigente para operar el Intoxilyzer 9000, ya que su licencia había vencido el 23 de mayo de 2021, aproximadamente un mes y pocos días antes del accidente. Indicó que renovó la licencia en enero de 2023. Sin embargo, sostuvo que para la prueba del 28 de junio de 2021 siguió los mismos pasos operacionales conforme a sus adiestramientos previos.**[31]

**Testimonio de la Sargento Waleska González**

**En cuanto a cómo la Sargento Waleska González obtuvo conocimiento de que la apelante fue la causante del accidente, la testigo declaró que llegó el día de los hechos llegó al lugar del accidente ya que estaba en una patrulla a 3 o 4 millas de distancia del lugar y que notificó por radio al personal de Patillas que se movilizara y que cuando llegó no había**

---

[25] *Íd.*pág.287, líneas 25-26 y pág. 292, líneas 15-23
[26] *Íd.* pág. 293, líneas 9-10.
[27] *Id.* págs.295-297
[28] *Id.*
[29] *Id.* pág.297, líneas 15-16
[30] *Id.* pág. 301, líneas 1-11.
[31] *Id.* págs. 303-305.

vehículo y que la motora accidentada estaba pegada a una de las paredes del negocio cercano, La Terraza de Chiqui y había llegado personal de Patillas.[32] Continuó su testimonio expresando que se enteró que habían trasladado al perjudicado al hospital; que permaneció en la escena con los demás agentes; que vio una mancha de sangre en el carril y que mientras estaba allí la agente Gloria Castillo, retén del distrito de Patillas le indicó que tenía una confidencia sobre la persona involucrada en el accidente .[33] La testigo continuó declarando que la retén le informó que la persona se llamaba Mildred y su ex esposo era de apellido Vega, y aseguró que se trataba de Mildred Maldonado Lind, que la conocía ya que la había supervisado; que esta trabajaba en el cuartel el Arroyo y la identificó en sala.[34] La Sargento González declaró que la apelante se había ausentado ya que se había reportado enferma horas antes de comenzar su turno de 7 de la noche a 3 de la madrugada, el cual había sido antes el turno de la testigo, y que se movilizó a la residencia de la apelante con otros agentes la cual quedaba cerca del lugar del accidente.[35]

La Sargento González atestiguó que cuando llegó a la residencia de la apelante el vehículo estaba estacionado en reversa con el frente hacia la carretera; que se desmontaron de la patrulla y esta salió de la casa.[36]La Sargento González afirmó que la apelante se fue acercando y le dijo que no lo había visto, que estaba muerto y que entonces procedió a leerle las advertencias porque se había percatado que expedía un fuerte olor a alcohol, que tenía dificultad para expresarse, y que estaba llorosa por lo que le hizo las advertencia Miranda.[37] Continuó su testimonio narrando que posteriormente fue con una grúa y ocupó el vehículo de la apelante y la motora del perjudicado y que los llevó al Cuartel de Arroyo donde el Personal de Servicios Técnicos se ocupó de obtener ADN y fotografías.[38]

Esta declaró además, que posteriormente acudió al Centro Médico y que allí además, de

---

[32] Transcripción de la Prueba pág. 399, Líneas 7-29 y pág. 400, Líneas 10-31.
[33] *Id*. pág.401, Líneas 1-31
[34] *Id*. pág. 402, Líneas 8-16
[35] *Id*. Pág. 403
[36] *Id*. pág. 404.
[37] *Id*. pág.406, Líneas 4-26.
[38] *Id*. pág. 415, Líneas 8-28.

entrevistar a la madre del perjudicado comenzó a recopilar información sobre posibles testigos para determinar la forma en que ocurrió el accidente.[39] Particularmente, la testigo declaró sobre el *Exhibit* 6-C y explicó que "esta PPR es la que se completa cuando hay una rueda de identififación".[40] La testigo explicó que se llena en todas sus partes para llevar a cabo la rueda de confrontación; que una vez culminada, la persona acusada la firma y detalló que en dicho documento está también la firma de la persona que la identificó y el de la agente. La Sargento González afirmó que la rueda de confrontación se llevó a cabo por la Agente Carla Colón de la División de Estudios Técnicos y que la testigo estuvo presente ya que fue quien la coordinó.[41]

**La Sargento Waleska González atestiguó específicamente que llevó a cabo la rueda de confrontación porque durante su investigación le llegó información de una persona que podía identificar a la conductora que conducía el vehículo la noche de los hechos.[42] Puntualizó que esa persona era el Sr. José Cora; que lo entrevistó y que al este decirle que podía identificar a la persona que causó el accidente, ella coordinó la rueda de confrontación.[43] La testigo expresó que en la rueda de confrontación había como cinco personas y que una vez entra el Sr. José Cora este identificó a la apelante como la conductora del vehículo que se marchó del lugar del accidente la noche de los hechos y .[44] La sargento Waleska González se refirió al Exhibit 6-C como "el PPR donde se identifican las personas que están en la rueda de confrontación la cual afirmó se celebró el 6 de marzo de 2021 a las 11:22 AM en la Comandancia de área.[45] Sobre el Exhibit 6-C, la testigo señaló que allí está la fecha de los hechos, la horay el número de querella, entre otra información.[46] Sobre estos extremos la testigo enfatizó que estuvo presente durante la rueda confrontación en todo momento, que dicho documento sobre la rueda de confrontación incluyó el 21 de junio de 2021, como día de los hechos, describió el lugar, la**

---

[39] *Id*. páginas 421-422
[40] *Id*. pág. 422, Líneas 1-2.
[41] *Id*. pág. 422, Líneas 5-31.
[42] *Id*. pág. 422, Líneas 27-29.
[43] *Id*. pág. 423, Líneas 4-8.
[44] *Id*. pág.423, Líneas 9-15.
[45] *Id*. pág. 423, Líneas 19-25.
[46] *Id*. pág.423, Líneas 28-29.

**persona sospechosa y la persona que la identificó, en este caso el Sr. José Cora, quien firmó el documento.**[47]

**La sargento Waleska González también declaró sobre el lugar del accidente. A esos fines se le mostró el _Exhibit_ 3-A consistente en una fotografía del lugar de los hechos, así como el _Exhibit_ 3-B y el _Exhibit_ 5 y esta identificó el negocio cercano y la intersección en la que ocurrió el accidente así como la mancha de sangre en dicha intersección, la cual afirmó que fue la que vio el día del accidente cuando acudió al lugar de los hechos.**[48]

**La testigo además declaró sobre el _Exhibit_ 3-B consistente en una foto en la que aparece donde termina la línea blanca y que contiene una mancha de sangre cerca de la línea central y el carril contrario.**[49] **La Sargento Waleska González afirmó que con relación al vehículo el cuerpo de la víctima cayó en el lado derecho, cerca de la goma posterior y que de acuerdo a su investigación el vehículo había quedado en medio del carril que iba de Patillas hacia Maunabo, cerca de la intersección que es como una Y de la 757 hacia Patillas.**[50] **La testigo expresó que la apelante venía de una carretera secundaria y que para lograr acceso a una carretera primaria obligatoriamente tenía que hacer un PARE para luego mirar hacia ambos lados, para así accesar a la carretera primaria y que allí había un rótulo de PARE.**[51]

Durante su testimonio la sargento González Cora indicó que procedió a leerle a la apelante las advertencias relacionadas a conducir bajo los efectos de bebidas embriagantes y las advertencias de Miranda.[52] Explicó que le hizo esas advertencias porque percibió de la señora Maldonado un fuerte olor a alcohol, dificultad al expresarse, temblor, llanto y lo que describió como "la lengua pesada" mientras esta hablaba.[53] La testigo declaró que una vez terminó de leerle las advertencias a la apelante  le explicó que sería puesta bajo arresto y llevada al cuartel

---

[47] _Id_. pág. 424, Líneas 1-7 y Líneas 19-26.
[48] _Transcripción de la Prueba_, pág. 426, Líneas 7-31
[49] _Id_. pág. 427, Líneas 2-6.
[50] _Id_. pág.427, Líneas 7-31 y pág. 428, Línea 1.
[51] _Id_. pág. 428, Líneas 8-30.
[52] _Transcripción de la Prueba_, página 406, líneas 14-26.
[53] _Id_. pág. 406, líneas 16-18.

de Patillas para que personal de Patrullas de Carretera le realizara la prueba de alcohol.[54] Señaló que, una vez en el cuartel, se completó el documento de advertencias en todas sus partes y se le dio para que lo firmara.[55] Finalmente, testificó que, luego de que la señora Maldonado Lind firmó las advertencias, permanecieron en el cuartel hasta que llegó el agente Pacheco para realizarle la prueba de aliento.[56] Indicó que el agente Pacheco observó la hora para darle el tiempo requerido por ley de observación. Luego de realizada la prueba, el agente Pacheco le entregó una copia del análisis, cuyo resultado fue 0.213.[57]

**Testimonio de la Agte. Zuleika Santiago Goden**

La agente Santiago Goden declaró que está adscrita a la División de Alcohol, Radar y Fotómetros del Negociado de Tránsito en Bayamón; que lleva aproximadamente catorce años y medio en la Policía y que ha trabajado once años en la División de Alcohol, Radar y Fotómetros. La agente Santiago Goden afirmó que es técnica e instructora del Intoxilyzer 9000 desde el año 2015. Sobre su preparación, la testigo declaró que tomó un adiestramiento con personal de la CML, a quienes describió como la entidad encargada de adiestrar en Estados Unidos para instrumentos como el Intoxilyzer 9000. Añadió que en ese adiestramiento se cubren todos los componentes del instrumento, cómo se utiliza y cómo se puede reparar. Destacó que, además del "adiestramiento de CMI, desde el 2015 está certificada por el Departamento de Salud a dar adiestramientos, ofrecer mantenimiento, calibrar y reparar el instrumento Intoxilyzer 9000.[58]

La testigo indicó que ofrece el adiestramiento para operar el Intoxilyzer 9000 desde 2016 y que desde 2016 hasta el presente el adiestramiento para operar el instrumento no ha cambiado; que la operación del instrumento no ha cambiado; que el instrumento tampoco ha cambiado; que igualmente los pasos operacionales no han cambiado; y que la funcionalidad del Intoxilyzer 9000 no ha cambiado.[59]

Además, la testigo afirmó que brinda mantenimiento a los instrumentos Intoxilyzer 9000 en varias jurisdicciones, incluyendo Juncos, Caguas, Cayey, Salinas, Guayama, Patillas, Juana Díaz y Santa Isabel y que,

---

[54] *Id*. pág. 406, Líneas 28-30.
[55] *Id*. pág. 407, Líneas 22-24.
[56] *Id*. pág. 412, Líneas 25-26.
[57] *Id*. pág. 413, Líneas 7-9.
[58] *Id*. Págs. 346-348
[59] *Íd*. pág. 353, líneas 9-13; pág.360, líneas 16-31, pág. 361, líneas 1-19

para los meses de mayo, junio y julio de 2021, ella era la persona encargada de darle mantenimiento y calibrar el Intoxilyzer 9000 del Distrito de Patillas.[60]

**Asimismo, la testigo indicó que inspeccionó y calibró la máquina de Patillas el 11 de mayo de 2021 y que pasó la prueba de calibración y estaba en buenas condiciones; que igualmente la inspeccionó y calibró en junio y en julio de 2021.[61]**

**La agente Santiago Goden declaró que, si un agente garantiza los veinte minutos de observación requeridos por reglamento y sigue los pasos operacionales, el resultado de la prueba es confiable y estableció que, tras revisar los documentos, y conforme a la certificación y los pasos operacionales reflejados en los documentos discutidos en sala, la prueba y el resultado del 28 de junio de 2021 eran confiables.[62]**

**Sobre estos extremos, la testigo aclaró que, si se siguen los pasos operacionales y se ejecuta la prueba correctamente, el resultado no va a cambiar. Al preguntársele por el resultado del 28 de junio de 2021 a la luz del reglamento y las cualificaciones requeridas para un operador, esta declaró que el resultado de la prueba "no va a cambiar" y que sería el mismo si lo realiza un operador con certificación o uno sin certificación.[63]**

### Testimonio del Sr. Gilberto A. Vicente Cruz (señor Vicente Cruz)

El señor Vicente Cruz declaró que es químico de toxicología de alcohol para el Departamento de Salud desde el año2008 hasta el presente; que sus funciones en el Laboratorio de Toxicología de Alcohol del Departamento de Salud incluyen verificar el mantenimiento de las máquinas Intoxilyzer 9000 que utilizan los agentes para pruebas de aliento, analizar muestras de sangre para determinar concentración de alcohol y servir como perito en los tribunales.[64] El testigo afirmó que ha estado verificando la calibración del instrumento Intoxilyzer 9000 del distrito de Patillas desde que comenzó ese programa, alrededor del año 2008; que él fue quien realizó las verificaciones de calibración del instrumento de Patillas para los meses de mayo, junio y julio.[65]

---

[60] *Id.* pág. 353, líneas30-31; pág. 368, líneas 5-7
[61] ***Id.* págs.371-373**
[62] ***Id.* pág. 361, líneas 22-26, pág. 362, líneas 22-30.**
[63] ***Íd.* pág. 366, líneas 1-2; pág. 388, líneas 20-29**
[64] *Id.* págs.494-495.
[65] *Íd.* pág. 500, líneas 5-9; pág. 503, líneas 25-28.

Declaró que en junio de 2021 efectuó la verificación el 8 de junio de 2021 y que los valores, incluyendo los "air blanks", estaban dentro de los parámetros, por lo que la máquina se encontraba en buenas condiciones. Añadió que, **para esos meses, los resultados de las pruebas realizadas en ese instrumento eran confiables.**[66]

Finalmente, el testigo declaró que, ante el hecho la señora Mildred Maldonado Lind arrojó una concentración de alcohol de 0.213 en una prueba de aliento realizada a la 1:39 a.m. del 28 de junio de 2021 y de que **el agente Pacheco Ramos siguió los pasos operacionales correspondientes y le garantizó el periodo de veinte (20) minutos de observación previo a la toma de la muestra, el resultado era confiable**. Además, enfatizó que **al examinar la tarjeta de resultado no observó elemento alguno que invalidara la prueba.**[67] Por último, en cuanto al alcohol que podía tener la señora Maldonado Lind al momento del accidente ocurrido a las 11:21 p.m. del 27 de junio de 2021, el testigo afirmó que, ese nivel sería mayor que 0.21, entre 0.33 y0 .218.[68]

El 19 de febrero de 2025, el Jurado encontró a la apelante culpable por infracción al Artículo 5.07 (B), al Artículos 7.06 y al Artículo 4.02 de la *Ley de Vehículos y de Tránsito Puerto Rico*, 9 LPRA secs. 5001-5727 (Ley Núm. 22-2000).

Tras recibir el Veredicto de culpabilidad, el **4 de abril de 2025**, el foro primario pronunció la siguiente *Sentencia* en contra de la apelante:

Que habiendo sido la acusada de epígrafe juzgada debidamente por los miembros de un jurado y declarada convicta del delito de: un (1) cargo por Artículo 5.07.B Ley 22- Grave(2000), un (1) cargo por Art.7.06 Ley 22 Grave(2000),y un (1) cargo por Art. 4.02 Ley 22, el Tribunal en cumplimiento de su veredicto del 19 de febrero de 2025 debe condenar y condena a dicha acusada a la pena de:

- En el caso **GLE2023G0053** por el *Art. 5.07.B Ley 22-* **cinco (5) años** de cárcel.
  Se le ordena al Secretario de Transportación suspender o revocar todo permiso o privilegio de

---

[66] *Id*. pág. 508-509.
[67] *Id*. pág. 510.
[68] *Id*. pág. 514.

conducir por igual término, luego de cumplido el término de reclusión.

En el caso **GLE2023G0054** por el *Art. 7.06 Ley22* - **cinco (5) años** de cárcel, multa de $1,000.00. Se ordena la conversión de la sentencia, a pena de cárcel. La acusada cumplirá 20 días de cárcel.

Restitución de $1,000.00.

Se le ordena al Secretario de Transportación suspender o revocar todo permiso o privilegio de conducir por igual término, luego de cumplido el término de reclusión.

Se ordena la asistencia y completar el Programa de Orientación de ASSMCA, Servicios Especializados para Vías Libres de Alcohol y Sustancias. Tratamiento basado en evidencia y Panel del Impacto a Víctimas.

-En el caso **GLE2023G0055** por el **Art. 4.02 Ley 22** tres (3) años de cárcel.

Se le ordena al Secretario de Transportación, suspender o revocar todo permiso o privilegio de conducir por igual término, luego de cumplido el término de reclusión.

-Los casos *GLE2023G0053* y *GLE2023G0054*, se cumplirán concurrentes entre sí, **consecutivos con** el **caso GLE2023G0055** y **consecutivos** con cualquier otra sentencia que estuviese cumpliendo.

-Se exime en todos los cargos del pago del arancel de la Ley 183, enmendada por la Ley 195 de agosto de 2000. Y se ordena que la sentenciada sea trasladado sin demora al cuidado del funcionario correspondiente y sea detenido por éste hasta que la sentencia se hubiere cumplido.

Inconforme con el veredicto y con la *Sentencia* dictada por el foro primario, la apelante acude ante nos mediante el recurso de epígrafe y señala la comisión de los siguientes errores por parte del foro primario:

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ENCONTRAR CULPABLE A LA SEÑORA MILDRED MALDONADO LIND CON UNA PRUEBA QUE NO DERROTÓ LA PRESUNCION DE INOCENCIA Y MUCHO MENOS DEMOSTRO SU CULPABILIDAD MÁS ALLA DE DUDA RAZONABLE

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ADMTIR EN EVIDENCIA UNA PRUEBA DE ALIENTO OFRECIDA POR EL MINISTERIO PÚBLICO PARA INTENTAR DETERMINAR EL ALEGADO NIVEL DE ALCOHOL EN SANGRE DE LA SEÑORA MILDRED MALDONADO LIND, YA QUE EL AGENTE QUE REALIZÓ DICHA PRUEBA NO POSEÍA LA CORRESPONDIENTE CERTIFICACIÓN VIGENTE QUE LO AUTORIZABA A PODER EJECUTAR EL PROCEDIMIENTO CONFORME EL VIGENTE REGLAMENTO DEL DEPARTMENTO DE SALUD.

ESTO ANTERIOR, A PESAR DE QUE HUBO UNA OBJECIÓN OPORTUNA BAJO EL FUNDAMENTO CORRECTO. POR SU PARTE EL TRIBUNAL DE PRIMERA INSTANCIA DE GUAYAMA HIZO CONSTAR PARA RÉCORD UNA OBJECIÓN CONTINUA DURANTE TODO EL JUICIO SOBRE TODO LO RELACIONADO CON ESTA PRUEBA ERRÓNEAMENTE ADMITIDA.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL SENTENCIAR A LA SEÑORA MALDONADO LIND, POR EL ART.402, DE FORMA CONSECUTIVA CON LOS OTROS CARGOS, YA QUE EN EL MOMENTO DE OCURRIDOS LOS HECHOS DICHO ARTÍCULO NO REQUERÍA QUE LA PENA FUERA IMPUESTA DE MANERA CONSECUTIVA. ELLO DEBIDO A QUE TODOS LOS CARGOS EN LA CUSA DE EPÍGRAFE SURGEN DE UNOS MISMOS HECHOS, FUERON SOMETIDOS CONJUNTAMENTE Y SE VENTILARON EN UN MISMO PROCESO, NO EXISTIENDO IMPEDIMENTO LEGAL ALGUNO PARA QUE FUERAN IMPUESTOS TODOS DE MANERA CONCURRENTE ENTRE SI.

LA AQUÍ APELANTE NO RENUNCIA AL DERECHO DE PODER PRESENTAR ERRORES ADICIONALES DE DERECHO ANTE EL HONORABLE TRIBUNAL DE APELACIONES TRAS LA DEBIDA EVALUACIÓN DEL EXPEDIENTE DEL TRIBUNAL DE PRIMERA INSTANCIA Y LA TRANSCRIPCIÓN DE LA TOTALIDAD DE LA PRUEBA ORAL DESFILADA DURANTE EL JUICIO EN SU FONDO- POR EL ABOGADO APELATIVO A QUIEN EVENTUALMENTE SE LE ASIGNE LA PRESENTE APELACIÓN. (*HENDERSON V. U.S.* 133 *S CT.1121;2013*) Y (*PUEBLO V. SOTO RÍOS*, 95 D.P.R. 483, 1967).

El 25 de septiembre de 2025, se presentó la Transcripción de la Prueba Oral de Oficio en el caso de epígrafe.

Posteriormente, el **30 de diciembre de 2025**, la señora Maldonado Lind presentó *Alegato de la Apelante* y tras examinar la Transcripción de la Prueba Oral de Oficio, la apelante expone que, la certificación vencida del operador del instrumento Intoxilyzer 9000 **invalida el resultado arrojado por dicho instrumento**. Sostiene además, que como al momento de la comisión de los hechos, el Art. 4.02 de la Ley Núm. 22, *supra*, disponía una **pena de** reclusión por **término fijo de tres** (3) **años, incidió el foro primario al imponer de forma consecutiva el cumplimiento de la pena por infracción a dicho artículo.**

El 30 de enero de 2026, compareció ante nos el Pueblo de Puerto Rico, por conducto del Procurador General, mediante el correspondiente alegato. En síntesis, argumenta el Pueblo que cuando se examina la prueba que desfiló en el juicio, así como el marco normativo que rige la apreciación de la prueba, la admisibilidad de las pruebas de aliento y la discreción judicial en la imposición de sentencias, resulta evidente que no le asiste la razón a la apelante en ninguno de sus planteamientos y que el Ministerio Público probó más allá de duda razonable todos los delitos por los cuales la apelante fue convicta. Arguye además, que la prueba de aliento se realizó con suficientes garantías de confiabilidad por lo que no procedía su exclusión.

Por último es la postura del Pueblo que al disponer que la pena impuesta por infracción al Art.4.02 de la Ley Núm. 22, *supra*, se cumpliría de forma consecutiva, el foro primario actuó al amparo de la discreción que le confiere la Regla 179 de Procedimiento Criminal, 34 LPRA Ap.II, R. 179.

-**II**-

A. ***Ley de Vehículos y Tránsito de Puerto Rico y Reglamento Núm. 7318***

La Ley Núm. 22 de 7 de enero de 2000, según enmendada, conocida como *Ley de Vehículos y Tránsito de Puerto Rico*, (Ley Núm. 22-2000), establece como política pública que constituye una amenaza a la seguridad pública el manejo de vehículos en las vías públicas bajo los efectos de bebidas embriagantes, drogas o sustancias controladas. 34 LPRA sec. 5201.

Dispone el **Artículo 4.01** de la Ley 22-2000, que "[e]l conductor de todo vehículo involucrado en un accidente del que resultaren daños a otro vehículo u otra propiedad, o del que resultare lesionada o muerta una persona, detendrá inmediatamente su vehículo en el lugar del accidente o tan cerca del mismo como fuere posible, de tal forma que no obstruya el tránsito, y dará cumplimiento a todas las obligaciones que bajo esta Ley se disponen.'' 9 LPRA sec.5101

De otra parte, el **Artículo 4.02** de la Ley Núm. 22-2000, 9 LPRA sec. 5102 penaliza a quienes se fugan del lugar del accidente en el cual estuvieron envueltos, y dispone que:

Todo conductor que no parare su vehículo en las circunstancias expuestas en el Artículo 4.01 de esta Ley, incurrirá en delito menos grave y convicto que fuere será sancionado con pena de reclusión por un término no mayor de seis (6) meses, pena de multa no menor de quinientos (500) dólares ni mayor de cinco mil (5,000) dólares, o ambas penas a discreción del Tribunal. Al registrarse una convicción por violación o infracción a este inciso, el Secretario revocará la licencia o el permiso de conducir y todo privilegio de conducir concedido a un residente o no residente por el término de un (1) año.

(b) Todo conductor que no parare su vehículo en las circunstancias expuestas en el Artículo 4.01 de esta Ley y como consecuencia del accidente **causare a otra persona daño corporal, incurrirá en delito menos grave y** convicto **que fuere será sancionado con pena de reclusión por un término fijo de tres (3) años.** Si el conductor que no parare su vehículo en las circunstancias expuestas en el Artículo 4.01 de esta Ley y como consecuencia del accidente causare a otra persona grave daño corporal, incurrirá en delito grave y convicto que fuere será sancionado con pena de reclusión por un término fijo de cinco (5) años. "Grave daño corporal" significará aquel daño que resulte en la incapacidad física o mental, ya sea parcial o total, temporal o permanente, que afecte severamente el funcionamiento fisiológico, físico o mental de una persona. También, incluye un daño corporal que envuelva un riesgo sustancial de muerte, pérdida de la conciencia, dolor físico

extremo, desfiguración prolongada y obvia, pérdida prolongada o incapacidad de la función de un miembro del cuerpo, órgano o facultad mental.

El **Artículo 5.07(B)** de la Ley Núm. 22-2000, *supra*, 9 LPRA sec. 5127, tipifica como conducta penal conducir un vehículo de tal manera imprudente o negligente que ocasione lesiones corporales a otra persona que requiera hospitalización, tratamiento prolongado o genere un daño permanente o lesiones mutilantes. Esta disposición agrava la conducta cuando, el conductor va a la fuga del lugar del accidente. Los elementos del delito incluyen, por tanto: (1) conducir un vehículo de forma imprudente o negligente; (2) causar lesiones corporales; y, (3) huir del lugar del accidente. A esos fines, el Artículo 5.07(B), *supra*, dispone en lo pertinente:

> En aquellos casos en que la persona que condujere un vehículo de forma imprudente o negligentemente ocasione a otra persona una lesión corporal que requiera hospitalización, tratamiento prolongado o genere un daño permanente o lesiones mutilantes, incurrirá en **delito menos grave con una pena fija de tres (3) años de reclusión** y el Secretario le revocará todo permiso o privilegio de conducir por igual término. No obstante, lo anterior, si la persona que condujere un vehículo de forma imprudente o negligente, con menosprecio a la seguridad, que ocasione a otra persona una lesión corporal que requiera hospitalización, tratamiento prolongado o genere un daño permanente o lesiones mutilantes, **se va a la fuga, incurrirá en delito grave con pena fija de (5) años de reclusión** y el Secretario le revocará todo permiso o privilegio de conducir por igual término. Este término de reclusión deberá cumplirse de forma consecutiva con cualquier otro término de reclusión por los mismos hechos. (Énfasis suplido).

En cuanto al manejo de vehículos bajo los efectos de bebidas embriagantes, el Artículo 7.02 de la referida ley dispone lo siguiente:

> En cualquier proceso criminal por infracción a las disposiciones del Artículo 7.01 de esta

Ley, aplicarán las siguientes normas con relación al nivel o concentración de alcohol existente en la sangre del conductor al tiempo en que se cometiera la alegada infracción, según surja tal nivel o concentración del análisis químico o físico de su sangre, de su aliento, o cualquier sustancia de su cuerpo constituirá base para lo siguiente:

(a)      Es ilegal per se, que cualquier persona de veintiún (21) años de edad, o más, conduzca o haga funcionar un vehículo de motor, cuando su contenido de alcohol en su sangre sea de ocho centésimas del uno por ciento (0.08%) o más, según surja tal nivel o concentración del análisis químico o físico de su sangre o aliento.

(b)      …

(c)      ....

(d)      …

El Artículo 7.04 será aplicable a todo aquél que no cumpla con lo aquí dispuesto.

Toda agencia, corporación e instrumentalidad gubernamental establecerá por reglamento la sanción o sanciones administrativas aplicables a todo aquel empleado o funcionario que no cumpla con lo dispuesto en este inciso.

**Las disposiciones de los anteriores incisos (a), (b), y (c) y (d) <u>no deberán interpretarse en el sentido de que las mismas limitan la presentación de cualquier otra evidencia competente sobre si el conductor estaba o no bajo los efectos de bebidas embriagantes al tiempo de cometerse la alegada infracción</u>.**

(Énfasis suplido.)

9 LPRA sec.5202

El Artículo 7.06 de la Ley 22-2000, 9 LPRA sec. 5206 establece las siguientes penalidades en caso de grave daño corporal a un ser humano:

Si a consecuencia de la violación a lo dispuesto en los Artículos 7.01, **7.02** o 7.03 de esta Ley, **un conductor causare grave daño corporal a un ser humano, incurrirá en delito grave con pena de cinco (5) años de reclusión**, pena de multa no menor de mil (1,000) dólares ni mayor de cinco mil (5,000) dólares y pena de restitución. Además, conllevará la suspensión de la licencia de conducir por un término no menor de dos (2) años ni mayor de siete (7) años, así como no impedirá otro proceso, por los mismos hechos, por infracción a los Artículos 7.01, 7.02 o 7.03 de esta Ley.

[…]

Para los efectos de esta Ley, **"grave daño corporal" significará aquel daño que resulte en la incapacidad física o mental, ya sea parcial o total, temporal o permanente, que afecte severamente el funcionamiento fisiológico, físico o mental de una persona.** También, incluye un daño corporal que envuelva un riesgo sustancial de muerte, pérdida de la conciencia, dolor físico extremo, desfiguración prolongada y obvia, pérdida prolongada o incapacidad de la función de un miembro del cuerpo, órgano o facultad mental. [...] (Énfasis suplido.)

De otra parte, el Artículo 7.09 de la Ley Núm. 22-2000, dispone en lo pertinente lo siguiente:

Se considerará que **toda persona que transite por las vías públicas de Puerto Rico conduciendo un vehículo,** un vehículo de motor, un vehículo pesado de motor o un vehículo todo terreno **habrá prestado su consentimiento para someterse a la prueba de campo estandarizada de sobriedad _(Standard Field Sobriety Test)_ así como al análisis químico o físico de su sangre, o de su aliento o de cualquier sustancia de su cuerpo, para los fines que se expresan en este Capítulo**. La prueba de campo estandarizada de sobriedad, así como **la prueba inicial del aliento serán practicadas en el lugar de la detención, por el agente del orden público o cualquier otro funcionario autorizado por ley**. Si por **circunstancias de seguridad** no se puede realizar en el lugar de la detención se podrá realizar en un lugar cercano a la detención y/o en el cuartel más cercano.

_[ . . .]_

(a)         …

_[ . . . ]_

(g) Se ordena al Secretario del Departamento de Salud a reglamentar la forma y sitio en que habrán de tomarse, envasarse y analizarse las muestras de sangre o las de cualquier otra sustancia del cuerpo, así como aquellos otros procedimientos afines al análisis químico o físico, pero con sujeción a lo dispuesto en los incisos (i), (j) y (k) de este Artículo. Asimismo, se faculta al Secretario del Departamento de Salud para adoptar y reglamentar el uso de los instrumentos científicos que estimare necesarios para determinar la concentración de alcohol en la sangre, así como de drogas o sustancias controladas de los conductores que fueren detenidos por conducir o hacer funcionar vehículos bajo los efectos de bebidas

embriagantes, drogas o sustancias controladas. Esta facultad se extiende al instrumento que utilizará el agente del orden público para hacer la prueba inicial del aliento, según lo dispuesto en este Artículo.

9 LPRA sec. 5209

De conformidad a lo anterior, el Departamento de Salud promulgó el Reglamento Núm. 7318, a los fines de adoptar medidas que conduzcan a cumplir con el mandato de la Ley Núm. 22-2000. El Departamento de Salud es el encargado de regular el procedimiento para determinar el nivel de alcohol en la sangre por medio de pruebas de sangre y aliento. *Pueblo v. Caraballo Borrero*, 187 DPR 265,275 (2012). Actualmente este procedimiento está regido por el *Reglamento para regular los métodos y procedimientos para la toma y análisis de muestras de sangre y aliento por motivos fundados a conductores inhabilitados por el uso de alcohol, drogas y/o sustancias controladas,* **Reglamento Núm. 9234** de 3 de diciembre de 2020.

En lo pertinente al caso de autos, el Artículo VIII del Reglamento establece el procedimiento para llevar a cabo los análisis de aliento para determinar el nivel o la concentración del alcohol en la sangre. A esos efectos, el Reglamento dispone, que los instrumentos adoptados para realizar las pruebas de aliento serán únicamente operados por los agentes de la Policía Estatal de Puerto Rico, autorizados por el Superintendente o su representante autorizado, o los agentes de cualquier otro cuerpo policiaco, guardias o funcionarios autorizados por ley, **luego de ser**

**debidamente cualificados y certificados** para ello por el Secretario de Salud o su representante.[69]

Con relación a la prueba de aliento realizada específicamente con el *Intoxilyzer*, el Reglamento Núm. 7318, establece que antes de realizar la misma, se deberá mantener a la persona intervenida bajo observación por un periodo mínimo de veinte (20) minutos, contados a partir de la hora de la intervención.[70] Previo a llevar a cabo la prueba, el operador autorizado seguirá los pasos operacionales que aparecen en el Informe sobre Prueba de Alcohol por Aliento y Lista de Cotejo Operacional.[71] Luego de realizado el análisis, el agente entregará una copia del Informe sobre Prueba de Aliento y copia de la Tarjeta de Récord de Prueba al intervenido y, además, se enviará copia de los mismos al Fiscal de Distrito del lugar donde ocurrieron los hechos y, la Policía de Puerto Rico retendrá otra copia.[72] Los resultados de los análisis, "serán aceptados por el magistrado como evidencia Prima Facie para la determinación de causa probable para el arresto."[73]

En cuanto al mantenimiento y cotejo de calibración de los instrumentos, el Reglamento Núm. 7318 dispone que los químicos o tecnólogos médicos del Departamento de Salud y/o los técnicos de la Unidad de Alcohol de la Policía de Puerto Rico, verificarán la calibración del instrumento al menos una vez al mes, y se llevará un récord de ello.[74] En caso de que la verificación sea realizada por los técnicos de la Unidad de Alcohol de la

---

[69] Art. 8.07.
[70] Art. 8.14.
[71] Art. 8.16.
[72] Art. 8.17.
[73] Art. 8.18.
[74] Art. 8.24.

Policía de Puerto Rico, estos tendrán que notificar por escrito al Departamento de Salud el resultado de la misma, con copia de las tarjetas utilizadas.[75]

### B. Confiabilidad de Prueba

Tanto la Ley 22-2000 como las normas de derecho probatorio aplicables a evidencia científica, exigen el cumplimiento de los requisitos impuestos por el Reglamento Núm. 7318 cuando se realizan pruebas de aliento. *Pueblo v. Montalvo Petrovich*, 175 DPR 932, 958 (2009). Sobre todo, se debe cumplir con aquellos requisitos cuyo objetivo es garantizar un mínimo de precisión y confiabilidad de la prueba realizada." *Pueblo* v. *Montalvo Petrovich*, *supra*. **Dicho requisito incluye exigir que el Estado demuestre que: (I)** <u>**la persona que administró la prueba está debidamente cualificada y certificada por el Departamento de Salud;**</u> **(II)** <u>**que dicha certificación estaba vigente al momento en que se realizó la prueba**</u>; **(III)** <u>**que el instrumento había sido aprobado por el Departamento de Salud y certificado y calibrado conforme a la regulación aplicable y,**</u> **(IV)** <u>**que el instrumento estaba funcionando apropiadamente**</u>. *Id*.

Sin embargo, el Tribunal Supremo ha establecido también que no es necesario el cumplimiento estricto o literal de dichos requisitos, puesto que resulta suficiente el cumplimiento sustancial con los objetivos perseguidos por dicha regulación.[76] Consecuentemente, el Tribunal Supremo ha resuelto que no procede la exclusión automática de la prueba de aliento como evidencia, ante cualquier incumplimiento con lo dispuesto en la

---

[75] *Id*.
[76] *Id*. *Pueblo* v. *Montalvo Petrovich*, *supra*.

regulación de esta *Id.; Pueblo v. Caraballo Borrero*, 187 DPR 265,276 (2012). Es decir, que el tribunal debe determinar caso a caso, "la magnitud de la desviación y el impacto que esta puede tener sobre la confiabilidad y precisión de la evidencia."[77] En caso de que el incumplimiento sea "de tal magnitud que a juicio del juzgador la prueba" no sea confiable, la misma debe ser rechazada por el tribunal.[78] Lo importante es la confiabilidad de la prueba, puesto que "a fin de cuentas, lo que se persigue es encontrar la verdad." *Pueblo v. Caraballo Borrero*, *supra*, pág. 278.

En cuanto a esos extremos, es preciso destacar que nada impide que el Estado presente otra evidencia para demostrar que la persona imputada se encontraba bajo los efectos del alcohol. *Pueblo v. Montalvo Petrovich*, *supra*, pág. 961; *Pueblo v. Caraballo Borrero*, supra. Es decir, **la comisión del delito configurado en el Artículo 7.02 de la Ley Núm. 22-2000 puede establecerse por prueba independiente del resultado de los análisis.**[79] En lo pertinente, el Alto Foro ha señalado que el juzgador debe evaluar el dominio que tenía la persona sobre sí misma, **"la apariencia de sus ojos, el dominio del habla, el grado de control que ejerció sobre su vehículo hasta el momento del accidente, su estado anímico, así como cualquier otro factor que refleje el estado de sus facultades físicas y mentales."** *Pueblo v. Caraballo Borrero*, *supra*.

---

[77] *Pueblo v. Montalvo Petrovich*, supra, pág. 959; *Pueblo v. Caraballo Borrero*, supra, pág. 277.
[78] *Pueblo v. Montalvo Petrovich*, supra; *Pueblo v. Caraballo Borrero*, supra, págs. 277-278.
[79] *Pueblo v. Caraballo Borrero*, supra, pág. 281, citando a *Pueblo v. Zalduondo Fontánez*, 89 DPR 64, 71-71 (1963). Véase, además, *Pueblo v. Cruz Rivera*, 88 DPR 332, 335 (1963); *Pueblo v. De Jesús Marrero*, 88 DPR 154 (1963).

### C. Quantum *de Prueba*

La Constitución de Puerto Rico garantiza a toda persona acusada de delito el derecho fundamental a la presunción de inocencia. Const. PR, Art. II, Sec. 11. *Pueblo v. Resto Laureano*, 206 DPR 963, 967 (2021); *Pueblo v. De Jesús Mercado*, 188 DPR 467, 475 (2013). Además, la Regla 304 de Evidencia, 32 LPRA Ap. VI, R. 304 (1), ha incorporado este imperativo constitucional. Asimismo, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, reitera el precitado derecho fundamental: "*[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. […]*". A su vez, dicha norma constituye uno de los imperativos del debido proceso de ley al exigir que una persona acusada en un proceso criminal se presuma inocente, mientras no se demuestre lo contrario. *Pueblo v. Irizarry*, *supra*, pág. 786. *Pueblo v. León Martínez*, 132 DPR 746, 764 (1993). Para rebatir tal presunción, nuestro ordenamiento requiere que el Estado establezca la culpabilidad una persona imputada de delito más allá de duda razonable. *Pueblo v. Arlequín Vélez*, 204 DPR 117, 146 (2020). *Pueblo v. Toro Martínez*, *supra*, págs. 855-85; *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986). En otras palabras, se exige un *quantum* probatorio de más allá de duda razonable para controvertir la presunción de inocencia. *Pueblo v. Santiago*, *supra*, pág. 142.

El concepto de "duda razonable" implica necesariamente aquella que produce insatisfacción o intranquilidad en la conciencia del juzgador respecto a

la evidencia presentada en el caso. *Pueblo v. Irizarry, supra*, pág. 788. Sobre este requisito, el Tribunal Supremo ha reiterado que:

El Ministerio Fiscal no cumple con ese requisito presentando prueba que meramente sea "suficiente", esto es, que "verse" sobre todos los elementos del delito imputado; se le requiere que la misma sea "suficiente en derecho". Ello significa que la evidencia presentada, "además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación" o en un ánimo no prevenido [...] Esa "insatisfacción" con la prueba es lo que se conoce como "duda razonable y fundada". *Pueblo v. De Jesús Mercado, supra*, pág. 476, citando a *Pueblo v. Cabán Torres, supra*.

Por lo tanto, el *quantum de más allá de duda razonable* aplica para "*cada uno de los elementos del delito, la conexión de estos con el acusado y la intención o negligencia de éste*". *Íd., Pueblo v. Santiago, supra.* A su vez, se ha resuelto que:

La determinación de que cierta prueba es suficiente para demostrar la culpabilidad del acusado más allá de duda razonable es una cuestión de raciocinio, producto de un análisis de todos los elementos de juicio del caso y no una mera duda especulativa o imaginaria. *Pueblo v. De Jesús Mercado, supra,* págs. 475-476.

D. *La Deferencia al Jurado*

El trato marcado por deferencia hacia las determinaciones de los jurados se remonta al Siglo XVIII, cuando el derecho a juicio por jurado del "common law" inglés, fue ratificado mediante la aprobación de la Sexta Enmienda de la Constitución de los Estados Unidos de América. *Peña-Rodríguez v. Colorado*, 580 US 206, 231 (2017).

Las decisiones que toma *un jurado* son protegidas por el conocido "no impeachment rule", el cual fue

aplicado por primera vez en el caso inglés del año 1785, *Vaise v. Delaval,* 1 T.R. 11, 99 Eng. Rep. 944 (K.B. 1785). En este caso, se les impidió a los convictos del caso a cuestionar los procesos deliberativos del jurado. Las cortes estadounidenses fueron adoptando esta regla poco a poco, y *hoy día*, está consagrada en la Regla 606 de las Reglas de Evidencia Federal, 28 USCA.

Ahora bien, por otro lado, *en Puerto Rico*, el derecho a ser juzgado por un Jurado está consagrado en el Artículo II, Sección 11 de nuestra Constitución. También, así está consolidado estatutariamente, en la Regla 111 de las Reglas de Procedimiento Criminal, supra.

Este cuerpo, constituido de doce (12) personas de la comunidad, está encargado de recibir y evaluar la prueba presentada durante un juicio, y finalmente adjudicarla. Nuestro Tribunal Supremo describió de manera asertiva las funciones de este ensamblaje de juzgadores de la siguiente manera:

> La opción de un juicio ante un panel de jurados implica conferir a éstos la administración de la justicia, esto es la determinación final sobre culpabilidad. El Jurado, compuesto por una muestra representativa de la comunidad del acusado tiene como encomienda evaluar la prueba, recibir instrucciones sobre el derecho aplicable, deliberar en secreto y rendir un veredicto final. De entender el Jurado que el acusado incurrió en responsabilidad criminal por los hechos que se le imputan deberá determinar el delito específico o el grado del mismo, por el cual éste deberá responderle a la sociedad.
>
> *Pueblo v. Echevarría*, 128 DPR 299, 337-338 (1991).

Nuestro Máximo Foro ha sido consistente: las determinaciones de un Jurado merecen y demandan credibilidad, siempre que las mismas no estén vetadas de error manifiesto, pasión, perjuicio o

parcialidad. *Pueblo v. Negrón Ramírez,* supra, pág. 913; *Pueblo v. Acevedo Estrada,* supra, págs. 98-99; *Pueblo v. Colón Castillo*, 140 DPR 564, 580 (1996); *Pueblo v. Rosario Reyes*, 138 DPR 591, 598 (1995); *Pueblo v. Rivera Robles*, 121 DPR 858, 869-870 (1988); *Pueblo v. Cabán Torres*, 117 DPR 645, 653-654 (1986). En ausencia de tales circunstancias, la jurisprudencia impide la intervención en apelación. *Id.* Ello es así puesto que "[e]l jurado es el más indicado para otorgar credibilidad y dirimir conflictos de prueba. Son estos quienes normalmente están en mejores condiciones de aquilatar la prueba, pues gozan de la oportunidad de ver y escuchar directamente a los testigos." *Pueblo v. Ruiz Ramos*, 125 DPR 365, 400-401 (1990), citando a *Pueblo v. Pellot Pérez*, 121 DPR 791 (1988)." *Véase*, además, *Pueblo v. Rosario Reyes,* supra, págs. 598-599.

Ahora bien, esto no es sinónimo a infalibilidad. Ello tampoco implica que se hará caso omiso a los errores que haya cometido el foro de instancia en su evaluación. *Pueblo v. Pagán Díaz*, 111 DPR 608, 621 (1981). Después de todo, los tribunales apelativos, al igual que el tribunal sentenciador, tienen el derecho y el deber de "tener la conciencia tranquila y libre de preocupación". *Pueblo v. Irizarry*, supra, pág. 790; *Pueblo v. Acevedo Estrada*, supra, pág. 100. Un Tribunal revisor puede intervenir en la apreciación de un jurado, que culmine en un fallo condenatorio, cuando una evaluación de la prueba produzca "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado." *Pueblo v. Carrasquillo*

*Carrasquillo*, supra, pág. 551; *Pueblo v. Rivera Arroyo*, 100 DPR 46 (1971).

A esto añadimos que, tanto nuestro Tribunal Supremo, como el marco normativo sobre el derecho probatorio, han reconocido que un hecho puede ser establecido con solo el testimonio de una persona. *Pueblo v. Toro Martínez*, supra, pág. 860; *Pueblo v. Rodríguez Román*, 128 DPR 121, 128 (1991); *Pueblo v. Acevedo Quiñones*, 100 DPR 894, 899 (1972). Así también, la Regla 110 (D) de las Reglas de Evidencia, supra, establece que "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley".

Por tanto, las determinaciones del juzgador de los hechos no deben ser descartadas arbitrariamente ni deben sustituirse por otro criterio a menos que de la prueba admitida surge que no existe base suficiente para apoyarlas. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62 (1991). Es decir, solo debemos apartarnos de esta deferencia cuando la apreciación de la prueba se alejó demasiado de la prueba presentada o cuando la realidad no concuerda con la evidencia sometida durante el juicio, o ésta resultare increíble o imposible. *Pueblo v. Acevedo Estrada*, supra, págs. 98-99.

En cuanto a la revisión de una condena y la apreciación de la prueba que realiza el juzgador de los hechos, el Tribunal Supremo ha reiterado los límites que estas representan *Pueblo v. Toro Martínez, 200 DPR 834 (2018)*. En particular ha sido enfático sobre la importancia de la deferencia a la apreciación de la

prueba que hace el juzgador de los hechos, y ha expresado que "un tribunal revisor está vedado de intervenir con la adjudicación de credibilidad de los testigos, ni puede sustituir las determinaciones de hechos que a su amparo haya efectuado el foro primario basado en sus propias apreciaciones". *Pueblo* v. *Toro Martínez*, *supra* a la pág. 858. El juzgador de los hechos Jurado o Tribunal de Derecho es a quien le corresponde realizar ese ejercicio valorativo sobre la totalidad de la prueba y para ello solo necesita valerse del sentido común, la lógica y la experiencia para deducir cuál de las versiones, si alguna, prevalece sobre las otras. *Pueblo v. Colón, Castillo, 140 DPR 564, 578 (1996)*.

### E. Imposición de sentencias consecutivas

En cuanto al modo de cumplir la sentencia, de forma concurrente o consecutiva, la Regla 179 de Procedimiento Criminal, 34 LPRA Ap.II R. 179. dispone:

> **Cuando una persona fuere convicta de un delito el tribunal sentenciador, al dictar sentencia, deberá determinar si el término de prisión impuesto habrá de cumplirse consecutiva o concurrentemente con cualquier o cualesquiera otros términos de prisión.** Si el tribunal omitiere hacer dicha determinación el término de prisión impuesto se cumplirá concurrentemente con cualesquiera otros que el tribunal impusiere como parte de su sentencia, o con cualesquiera otros que ya hubieren sido impuestos a la persona convicta.

La determinación del modo de cumplir el convicto con los términos de prisión si concurrente o consecutivamente descansa en la sana discreción del tribunal sentenciador. Ello no constituye una violación al mandato constitucional contra la imposición de castigos crueles e inusitados si el juzgador de los hechos tomó en consideración que las penas decretadas

estuvieran dentro de los límites fijados por el estatuto correspondiente. *Pueblo* v. *Chévere Heredia*, 139 DPR 1, 21 (1995).

-III-

En términos generales como primer señalamiento de error arguye la apelante que la prueba desfilada por el Ministerio Público no logró derrotar la presunción de inocencia.

Surge de la prueba oral desfilada, particularmente del testimonio del perjudicado, que la señora Maldonado Lind condujo de manera imprudente y negligente, lo cual quedó establecido mediante la prueba sobre la manera en la que ocurrió el accidente. Sobre estos extremos el perjudicado, declaró que transitaba por la vía principal, que el área estaba iluminada, que no llovía y que, al aproximarse a la intersección frente al negocio La Terraza de Chiqui, observó venir un vehículo desde la vía secundaria y que continuó avanzando porque se encontraba en la vía principal, pero que el vehículo no se detuvo y lo impactó en la intersección. Esa versión fue consistente con el testimonio del ingeniero Márquez Martínez, quien certificó que en la intersección de la PR 757con la PR-3 (intersección en "T"), existen dos señales de "PARE" para quienes transitan por la PR-757 para poder acceder a la PR-3, la cual es la vía primaria. La vía por la cual se aproximaba el vehículo de la apelante era una vía secundaria sujeta a señal de "PARE" y a esta no detenerse en una intersección claramente rotulada; e invadir la vía principal hasta impactar a un motociclista que transitaba por su carril, ello constituye la negligencia sancionada por el **Artículo 5.07(B)** de la Ley Núm. 22-2000, *supra*

En lo pertinente al elemento de grave daño corporal, este quedó probado toda vez se estableció que el señor Ocasio Morales sufrió una fractura de fémur que requirió cirugía e implantación de varilla intramedular, hospitalización, incapacidad prolongada para caminar y terapias de rehabilitación. Además, el perjudicado sufrió una herida en la cabeza que requirió suturas. La prueba oral desfilada también estableció el elemento de la fuga contemplado en el **Artículo 5.07(B)** ya que varios testigos observaron que, tras el impacto, el vehículo dio reversa y abandonó el lugar mientras las personas le gritaban a la apelante que no se fuera. Esa conducta se corroboró cuando la sargento González Cora llegó a la escena del accidente; no encontró a la conductora y tras recibir información que vinculaba a la apelante con el accidente, tuvo que movilizarse hasta su residencia, donde encontró el vehículo estacionado y a la señora Maldonado Lind saliendo del área del vehículo. Dicha prueba oral estableció que la apelante no se detuvo ni permaneció en el lugar del accidente, conducta que constituye además, infracción al Artículo 4.02 de la Ley Núm. 22-2000, *supra*.

En cuanto a la infracción al Artículo 7.06, de la Ley Núm.22-2000, supra, el resultado de la prueba de aliento demostró que la apelante conducía bajo los efectos de bebidas embriagantes y que, como consecuencia, ocasionó el grave daño corporal ya descrito.

Sobre la admisión de esta prueba, en su segundo señalamiento de error, es la contención principal de la señora Maldonado Lind que la evidencia desfilada durante el juicio fue insuficiente para justificar su

convicción, porque según alega, procedía la exclusión automática de la prueba de aliento, debido a que el operador no tenía una certificación vigente al momento de los hechos y que además, el foro primario incidió al imponer la condena por violación al Artículo 4.02, de la Ley Núm. 22-2000, *supra*, de manera consecutiva.

Contrario a lo esbozado por la apelante, **una prueba de aliento realizada por un operador que tiene la certificación vencida no invalida el resultado de la prueba**. *Véase, Pueblo* v. *Montalvo Petrovich, supra.* Es doctrina reiterada que no es necesario el cumplimiento estricto o literal de dichos requisitos, puesto que resulta suficiente el cumplimiento sustancial con los objetivos perseguidos por la regulación. *Id.* **Sobre estos extremos conforme a la doctrina vigente no** procede la exclusión automática de la prueba de aliento como evidencia, ante cualquier incumplimiento con lo dispuesto en la regulación de esta *Id.; Pueblo v. Caraballo Borrero, supra.* Lo importante es la confiabilidad de la prueba. *Id.* Inclusive, independientemente del resultado de la prueba, puede establecerse que se estaba bajo los efectos del alcohol cuando concurren otras circunstancias que además, evidencian el estado de embriaguez, tales como la apariencia de sus ojos, el dominio del habla, el grado de control que ejerció sobre su vehículo hasta el momento del accidente, su estado anímico, así como cualquier otro factor que refleje el estado de sus de sus facultades físicas y mentales." *Pueblo v. Caraballo Borrero*, *supra*.

En el caso que nos ocupa la prueba oral desfilada y creída por el Jurado, particularmente el testimonio

del **agente Pacheco Ramos**, estableció **que cuando este fue al cuarto donde estaba el Intoxilyzer 9000, allí se encontraba la señora Maldonado Lind bajo arresto; <u>que percibió un fuerte olor a alcohol, que se sentía tan pronto entró al cuarto y que además de percibir el fuerte olor a alcohol, observó que la señora Maldonado Lind exhibía ojos rojos, pesadez al hablar y tardanza en contestar preguntas</u>.**[80]

Es pertinente además, que surge de la prueba oral desfilada y creída por el Jurado que **<u>la</u>** agente Santiago Goden **<u>atestiguó que inspeccionó y calibró la máquina de Patillas el 11 de mayo de 2021 y que pasó la prueba de calibración y estaba en buenas condiciones; que igualmente la inspeccionó y calibró en junio y en julio de 2021.</u>**[81]

Es preciso destacar que el Ministerio Público desfiló prueba ante el Jurado en la que estableció que la apelante, mientras conducía un vehículo de motor bajo los efectos del alcohol, invadió una intersección y arrolló al Sr. Bernardo Héctor Ocasio Morales ("señor Ocasio Morales", "perjudicado" o "Bernardo"), le ocasionó un grave daño corporal y, que esta abandonó la escena. De igual modo, estableció que la apelante, al momento de ser arrestada, todavía exhibía signos claros de intoxicación, y arrojó un resultado de 0.213 en la prueba de aliento, muy por encima del límite legal. Si bien el agente Pacheco Ramos tenía la certificación vencida al momento de tomar la muestra, lo cierto es que este estaba cualificado para realizarla y **siguió los**

---

[80] Transcripción de la Prueba Oral, pág. 286- líneas 1-9. y pág. 337, líneas 7-11
[81] *Id*.págs.371-373

**pasos establecidos para realizar la prueba; que el instrumento había sido aprobado, certificado y calibrado por el Departamento de Salud conforme a la regulación aplicable y que además el instrumento estaba funcionando apropiadamente**. Toda vez que al momento de hacer la prueba existían suficientes garantías de confiabilidad de la misma, no incidió el foro primario al admitirla. Ante este cuadro fáctico el Jurado, tras escuchar los testimonios y evaluar la prueba de cargo, halló a la apelante culpable por violaciones a los Artículos 4.02, 5.07 (B) y 7.06 de la Ley Núm.22-2000, *supra*.

En su tercer señalamiento de error la apelante sostiene que incidió el foro primario al imponer la sentencia por infracción al Art. 4.02, de la Ley Núm. 22, a cumplirse de forma con los otros cargos. Razona la apelante que al momento de ocurridos los hechos dicho artículo no requería que la pena fuera impuesta de manera consecutiva y que por ello y por surgir todos los cargos de los mismos hechos no existía impedimento para que fueran impuestos todos de forma concurrente.

Cabe señalar que el planteamiento de la apelante parte de la premisa de que el tribunal aplicó retroactivamente una versión posterior de la ley que exige la imposición obligatoria de penas consecutivas.

Sin embargo, advertimos que el tribunal sentenciador actuó conforme a la discreción que le reconoce la Regla 179 de Procedimiento Criminal, *supra*. Aun bajo la versión de la apelante referente a que el Artículo 4.02 de la Ley Núm. 22-2000, *supra*, vigente al momento de los hechos no contenía un mandato expreso de consecutividad, es preciso destacar que aun así el tribunal conservaba la facultad de ordenar que esa pena

se cumpliera de forma consecutiva. Precisamente porque la norma general es que ese asunto queda al ejercicio de la discreción judicial. Nada hay en la Sentencia apelada que nos lleve a concluir que el foro primario impusiera la consecutividad de las penas por mandato de ley.

De los **hechos probados ante el Jurado conforme a la credibilidad que le mereció la prueba oral desfilada en el juicio** surge que la apelante fue convicta bajo el Artículo 5.07(B) la Ley Núm. 22-2000, *supra*, por conducir de forma imprudente o negligente, ocasionar lesiones que requirieron hospitalización daño corporal grave y por no detenerse en el lugar del accidente. La señora Maldonado Lind fue convicta además, por infracción al el Artículo 7.06 la Ley Núm. 22-2000, *supra*, al causar grave daño corporal como consecuencia de conducir bajo los efectos de bebidas embriagantes. **Ante ese escenario constituyó un ejercicio discrecional del foro primario la imposición de las penas de manera consecutiva.**

-IV-

Evaluado el recurso y la prueba que obra en autos, y la norma anteriormente esbozada, justipreciamos que los errores señalados por la apelante no se cometieron. Los elementos de los delitos fueron probados más allá de duda razonable. Por todo lo cual ***confirmamos*** el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

*Lcda. Lilia M. Oquendo Solís*
*Secretaria del Tribunal de Apelaciones*